Argued at Pendleton May 7, modified July 9, 1929.

JAMES H. LANE *v.* H. F. SCHILLING, RECEIVER,
ET AL.

(279 Pac. 267.)

For appellants there was a brief and oral arguments by *Mr. Jay H. Upton* and *Mr. H. H. DeArmond.*

For respondent there was a brief over the names of *Mr. Herbert P. Welch* and *Mr. Denton G. Burdick,* with an oral argument by *Mr. Welch.*

McBRIDE, J.—This is an action for libel, which was originally begun against the First National Bank of Bend and C. S. Hudson, its president and general manager. The complaint was filed on December 8, 1925, and amended complaint was filed on June 7, 1926. The matter ran along without an answer being filed, and on May 10, 1927, the bank became insolvent and H. F. Schilling was appointed receiver by the Comptroller of the Treasury. On July 6th a motion was made to substitute Schilling as defendant in place of the First National Bank, which motion was allowed, and the action was thereafter continued under the present title, the bank being eliminated as a co-defendant.

The complaint charged that, on the seventeenth day of December, 1924, the defendants Hudson and the First National Bank caused to be written and sent a letter containing the alleged libelous matter. The letter grew out of a controversy between plaintiff and the bank, with which he had done business for a number of years, and concerned a settlement or attempted settlement between them. It appears that plaintiff had alleged that in the course of their busi-

ness he had not received credit in that settlement for certain cattle and other matters, and had written the bank frequent and annoying letters in regard to it, at least annoying to them. Hudson, the president and manager of the bank, wrote the letter in controversy, which is too lengthy to be copied in this opinion, it covering four or five pages of legal cap, accusing plaintiff of all sorts of dishonesties and unfair dealing, including actions criminal in their nature, and containing more than a dozen specifications of individual acts of dishonesty and bad faith. It was evidently written in a fit of anger, and contains a number of accusations which, if true, would have rendered the plaintiff here liable to criminal prosecution as well as justifying persons coming to a knowledge thereof in the belief of his general dishonesty and unfitness to be dealt with in a business way.

The plaintiff is a blind man and has been so for a period of years. In fact, during all of the transactions of the bank with him, he was wholly unable to read any written communication, depending upon his wife to read his letters to him, or, in her absence, depending upon other friends. It is alleged that the defendant and its manager and agents well knew this fact, and that, so knowing and with intent to injure the plaintiff, they wrote the letter and addressed it to the plaintiff, who received it in due course of mail. His wife being absent, he requested a friend by the name of Martin to read the letter to him, which Martin did, and on his wife's return he asked her to read it to him the second time, and he alleges that, by reason of this enforced publication of the letter, he is injured in the sum of $50,000.

The complaint alleged only the fact that plaintiff's wife read the letter, not specifying Martin as the first

reader of it. It alleges that by this enforced publication, plaintiff was greatly damaged in the eyes of his friends and associates; that his credit has been practically ruined, and contains the usual allegations concerning the publication of a libel.

The answer alleges that the letter was written in the ordinary course of business; justifies the libel, alleges that the matters stated therein were true, and further pleads that the defendants believed that they were true when they wrote the letter; alleges that it was written in the ordinary course of business in answer to plaintiff's letters, and denies the publication of it, except it alleges that the plaintiff's wife was his confidential agent in the matter of his correspondence; denies any publication of the letter beyond the fact that it was read by plaintiff's wife, and denies that the plaintiff was injured in any respect by any publication of the letter.

The testimony consists of 500 pages, and is to some extent contradictory. Martin testified to having read the letter to plaintiff at his request; says that they went into a corner of his store which was partly partitioned off from the main store building, and that he read the letter to him in that office; that there was a crowd gathered around the stove which was situated about six feet from the corner where the letter was read, and he did not know whether others heard any part of the letter or not. No person who saw the alleged crowd at the stove was called as a witness. Martin testified that he never said anything about the letter to anyone else, but there is testimony by another witness who keeps a garage in the town in which plaintiff lives that he subsequently heard three or four men speaking about the letter.

Plaintiff testified that he had his wife read the letter to him the second time to get a complete knowledge of it. There is no testimony as to whether his wife discussed the contents of the letter with others before the suit was brought. If she did, this would be no defense so far as the defendants are concerned, because she occupied no such confidential position in the matter as would make a publication by her a publication by the plaintiff. Plaintiff's testimony is to the effect that a knowledge of the letter by his associates and business friends greatly injured and destroyed his credit in the community, so that eventually he was forced to move out of it. His wife testified that she was greatly shocked by the contents of the letter, and, in effect, that her faith in her husband was so shaken that for a time she was estranged from him, slept in a separate bed, and the intimation is that, by reason of her having read the letter, she argued with plaintiff as to its truth and made things generally so uncomfortable for him that he left home for a month, although at the time of the trial they seemed to be on exceedingly good terms.

■ There was no necessity in the ordinary course of business for defendants to write this letter. It was abusive in the extreme, and it is evident that it could have served no good purpose. Defendant Hudson, knowing that plaintiff was blind and would necessarily be compelled to have his wife or somebody else read the letter to him, should have been more careful in respect to the matters he stated in it, and should not have gone in any way beyond the absolute truth. To write a letter of this character, which plaintiff's wife would be compelled to read, and which defendant Hudson had every reason to believe that she would read, was going beyond anything that the

law permits. It is just as much an offense, and perhaps more of an offense, to libel a man in such a way as to destroy the confidence of his wife, than it is to defame him to any other person; and, unless the defendants could justify the charges contained in the letter by proving their truth by a preponderance of the evidence, this publication alone, if it destroyed or weakened the confidence of plaintiff's wife in his integrity to such an extent as to cause him mental anguish or loss of consortium, was ground for damages.

■ We do not agree with counsel that the second reading of the letter by plaintiff's wife under the circumstances constituted a publication of libel by him. It would be only natural and prudent for a man in his blind condition, after having the letter read to him once, to give it a further reading in order to assure himself thoroughly of its contents; and it was a question for the jury to say whether, under all of the circumstances, considering the nearness of other persons to the place where Martin read the letter to plaintiff, it was probable that other persons might not have heard it without the agency of the plaintiff; and the fact that it was talked about by other parties, as testified by the person owning the garage, would indicate that in some manner it had leaked out without plaintiff's agency.

In a letter written long before the one in question the plaintiff apologizes to the bank for not having answered some communication, by stating that his reason for delay was the fact that his wife was away and he hesitated to have the letter read to him by other persons and thereby become public property, which indicates that he is not a person who would himself be likely to make a defamatory letter public.

Where it is shown that, without plaintiff's intention, a libelous letter has been made public, even to a single person, and also shown that thereafter other persons knew of it and discussed its contents, courts will not scrutinize too closely as to the source of the knowledge. A man who scatters seeds of Canada thistle to the winds should be held accountable without investigating too closely as to what particular breeze carried them on to his neighbor's land.

The plaintiff testifies that his credit and standing were injured in the community by this publication, and that there was no longer the same cordiality shown to him and his family as before the letter became known. It appears from the testimony that after he had closed up his stock business he was practically a man without means, and that he did not have any extensive personal credit for that reason. What effect this letter had is a matter of doubt and was for the jury, in view of the testimony. It does not appear to the writer that the influence exerted by the letter was very serious, although the contents of the letter had become so well known, as indicated by the testimony of Mr. Egli, the garageman, that it may have had some influence.

We think the defendants have failed to prove justification. At any rate the testimony on that subject was contradictory and not of sufficient strength to justify the assertions made in the letter. The dealings of the plaintiff and the bank had extended over a long series of years, and involved many transactions and many dollars one way and the other. The plaintiff labored under the disability of blindness and could not give the personal attention to details that one not thus afflicted would give, and it is also probable that, owing to his financial condition, he was

not always as prompt in keeping his business engagements as he otherwise might have been. A blind man must carry a great deal of his business in his head; and, in view of the extent of plaintiff's business, the scattered condition of his cattle, and the necessity of his relying upon others, it is not surprising that some deviation from the usual business methods may have occurred; but that these were intentional dishonesties is not proven by the testimony introduced by the defendants. At least they do not seem to have been in the minds of the jury.

One of the claims very strongly urged is that there is a variance between the complaint and the proof, in that it is alleged that the letter was first read by plaintiff's wife; but, taking the complaint as a whole, we do not think that there is any variance which misled the defendants in preparing their case or in defending it.

■ There is, however, one very serious objection in this case. The court, after very carefully instructing the jury as to the law in regard to the measure of damages, instructed them that if they found the publication to be false and malicious, they could also impose exemplary or punitive damages, which instruction, as applied to this case, we think was improper. Had this case been continued against the bank, there is no question, in view of the evidence, but that punitive damages might have been justified. However illogical as it may seem to give a plaintiff in a case of tort not only every cent in which he has been actually damaged, but also to allow him to recover an additional sum with a view of punishing the tortfeasor, that rule has become very firmly imbedded in our judicial utterances and by the holding of most of the courts, until a legislative enactment will be required

to do away with it. But we do not think that it extends so far as to include a receiver of a United States national bank, whose duty it is to represent creditors, depositors and stockholders in the proceeding.

The effect of allowing the plaintiff to recover punitive damages in this case would be to compel *bona fide* creditors and innocent depositors to pay not only the claim of plaintiff, not only his reasonable proportion of the assets of the bank, but, in addition to that, a sum of money as exemplary damages, to which he is not entitled as a matter of right and compensation, and thereby fine and punish other creditors and make plaintiff a preferred creditor beyond the extent of his actual damages.

Under the National Banking Act the receiver is directed to apply the assets of the bank, first to the redemption of the circulating notes of the bank, and, second, in a ratable disposition to the creditors of the bank. The plaintiff was not a creditor of the bank in a sense that the receiver had approved his claim, and will not have an approved claim and be a creditor until his claim has been converted into a judgment, after which time he is entitled to share ratably with other creditors.

In Tardy's Smith on Receivers, Volume 1, page 849, it is said:

"In respect to the past liabilities of the corporation, it is not pretended that the receiver can be personally held. Nevertheless he is the representative of the corporation, taking its place in respect to the custody and administration of its estate, and toward its claimants and creditors he occupies a relation somewhat analogous to that of an administrator. The functions of the corporation being suspended as to its former managers, the receiver takes their place

and holds and conducts everything in his own name. A suit, therefore, to ascertain and adjust a liability of the company is properly brought against the receiver in his capacity as such, somewhat in the same form as a suit against an administrator by a creditor of the estate of the deceased. The judgment goes against the defendant in his capacity as a receiver, and is liable out of the assets of the company in his hands. Such is the judgment in this case. Upon this judgment the court that granted leave to the plaintiff to sue will adjudge to him his equitable share in the assets of the company, and order payment according to the equities and priorities of the different claimants on the assets.''

Counsel for the defendants frankly state that they have found no authority exactly in point on this question, and counsel for the plaintiff do not seem to present any; but, as we have before stated, it is not right nor just that depositors should make vicarious atonement for the malice of a defunct bank. As said in the excerpt above quoted, the receiver occupies the position analogous to that of an administrator. From this standpoint there is a wealth of authority that, where a suit for tort has been begun against a defendant in his lifetime, even though the tort may be aggravated to such an extent as to have justified punitive damages they cannot be recovered against his personal representatives: *Sheik* v. *Hobson, Admr.,* 64 Iowa, 146 (19 N. W. 875); *Wright's Admx.* v. *Donnell,* 34 Tex. 291, 304; *Rippey* v. *Miller, Admr.,* 33 N. C. 247; *Morris* v. *Duncan,* 126 Ga. 467 (54 S. E. 1045, 115 Am. St. Rep. 105).

The case of *Sheik* v. *Hobson, Admr., supra,* is particularly instructive. It was a slander case, and among other things, the Iowa court said, at page 147:

''There is no doubt but at common law the remedy for an injury such as plaintiff complains of deter-

mines upon the death of the wrong-doer. 1 Chitty on Pleadings, 89. But, under our statute, Code, § 2525, all causes of action survive, 'and may be brought, notwithstanding the death of the person entitled or liable to the same.'

"Plaintiff's position is that, under this section, the right is preserved to her to have damages of this character assessed on account of the wrongful and malicious act by which she has suffered, notwithstanding the death of the one who committed the act.

"But we think the position is not sound. It cannot be said in any case (unless the right is created by statute), that the person who suffers from the wrongful or malicious acts of another has the right to have vindictive damages assessed against the wrong-doer. Such damages are awarded as a punishment of the man who has wickedly or wantonly violated the rights of another, rather than for the compensation of the one who suffers from his wrongful act. It is true, they are awarded to the one who has been made to suffer; but not as a matter of right. For, while he is entitled under the law to such sum as will fully compensate him for the injury sustained, the question whether punitory damages shall be assessed, and the amount of the assessment, is left to the discretion of the jury.

"Plaintiff had a right of action, on account of the slanderous words spoken by Rush, for such sum as would compensate her for the injury. This was her cause of action, and this is what was preserved to her by the statute at his death. But she had no personal interest in the question of his punishment. So far as he was concerned, the punitory power of the law ceased when he died. To allow exemplary damages now would be to punish his legal and personal representatives for his wrongful acts, but the civil law never inflicts vicarious punishment."

As will be seen by the quotation, this case is also valuable as to the contention of the plaintiff that our statute concerning survival of causes of action pre-

serves the right to punitive damages. Iowa has a statute similar to and even stronger than ours on that subject, and the remarks of the court upon the rights· of plaintiff under that section dispose of plaintiff's contention here.

It is suggested by the plaintiff's brief as a reason why punitive damages should be allowed that, under certain conditions, the bank can be reorganized and continue business; that, while now insolvent, it is still a legal entity and in the contingency of its revival may still be in a condition to respond to a judgment against the receiver. Conceding, without deciding, that this case comes within the rule announced in *Bingham* v. *Lipman,* 40 Or. 363 (67 Pac. 98), the possibility of the resurrection of the Bend National Bank is too remote to be the basis for a ruling holding the receiver to answer for vindictive damages. It became insolvent and went into the hands of the receiver in May, 1927, and is still in his hands. There is a possibility that a valuable meteor will fall in the City of Bend this year or next, and a possibility that the receiver will pay all the liabilities of the bank and hand the remaining assets over to an agent of its stockholders to be liquidated by them; the first event mentioned being about as probable as the second. The proceedings do not amount to a reorganization, but to the winding up of its affairs,—the funeral ceremonies.

■ To entitle the bank to liquidation by an agent, it must first have paid all its creditors except stockholders the full amount of their claims which have been proved or allowed, paid all expenses of the receivership, redeemed its notes in circulation and filed a bond to pay all other claims thereafter to be proved or allowed. Thereupon the assets remaining

may, under certain conditions, be turned over to the agent for the purpose of liquidation. The possibility of this being done is remote,. and the right of plaintiff to punish innocent stockholders and creditors by adding to their burdens not only what he is entitled to as a matter of right, but what he claims not as a matter of strict right but as a matter of grace, is not tolerable. The National Banking Act contemplates only compensation to claimants, not gratuities given for the purpose of punishing somebody. As the defendants are impleaded jointly, there cannot be separate verdicts in different amounts against each of them, so that what is error as to one defendant goes to the whole case.

■ So we have here a case where plaintiff has recovered a very large sum in damages against both of the defendants, and it is impossible to tell how much of the damages are punitive in their nature and how much compensatory; and this verdict is given under an instruction which we deem under the circumstances to be erroneous. There are abundant reasons why this case should not be sent back for retrial. The testimony amounts to over 500 pages and there are a large number of witnesses, and a retrial would involve a great expense. We have the testimony here, and under subdivision 3–c of Article VII of the Oregon Constitution, we are authorized to retry the case here and render such a judgment as we think just under the circumstances.

We do not think that the pecuniary damages resulting from loss of credit to plaintiffs amounts to a very large sum, although necessarily it must involve something. The fact that it resulted in estrangement in his family, which naturally would be a cause of men-

tal anguish to plaintiff, and which is actual damages in fact, seems to us to be considerable.

After carefully reading this testimony in all its bearings, we think that the sum of $4,000 will amply compensate plaintiff for every damage from a business point of view, or by injury to his feelings in the estrangement of his wife and the possible loss of friendship of his associates, and that is all that ought to be allowed in this case.

The judgment of the court below is reversed, and a judgment will be so entered as in a case of equity for the sum of $4,000 and the costs and disbursements in the court below and this court.          REVERSED.

RAND, BEAN and ROSSMAN, JJ., concur.