Argued and submitted May 18, judgment reversed and remanded in part; otherwise affirmed September 27, 1995, petition for review allowed January 23, 1996
(322 Or 489)

Linda DOWNS,
*Appellant,*

*v.*

WAREMART, INC.,
an Idaho corporation,
*Respondent.*

(92C-11646; CA A84549)

903 P2d 888

William D. Stark argued the cause and filed the brief for appellant.

William H. Walters argued the cause for respondent. With him on the brief were Thomas C. Sand and Miller, Nash, Wiener, Hager & Carlsen.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

HASELTON, J.

## HASELTON, J.

Plaintiff, Linda Downs, appeals from a judgment dismissing an array of claims that arose from defendant Waremart's termination of her employment as a manager at one of its stores. We affirm in part and reverse in part.

Viewed most favorably to plaintiff, the material facts are as follows: Plaintiff began working for defendant in 1985. From November 1990 until March 1992, when she was terminated, plaintiff was the video department manager at defendant's store 19 in Salem. During that time, the video department handled at least $100,000 in cash per week. Several times during plaintiff's tenure as manager before March 1992, her department's cash receipts were "short," *i.e.*, recorded sales exceeded the actual amount of money in the registers. However, the disparities were relatively small (the record discloses nothing in excess of $50), and plaintiff was not personally implicated.

In late January 1992, plaintiff attended a company training program that dealt, in part, with sexual harassment. During the program, defendant's president stated that the company had a strong policy against managers dating checkers and that "anybody that's doing this is walking on thin ice." At that time, DeWitt, an assistant manager at store 19, was dating Fowlds, a checker at store 20, and Atkinson, another assistant manager at store 19, was dating Wolford, a checker at store 19. DeWitt, Atkinson, Fowlds, and Wolford were all social friends of Erekson, the manager of store 19. Shortly after the training program, plaintiff confronted Dewitt and Wolford about their breaches of the anti-fraternization policy. Thereafter, DeWitt acted coldly toward plaintiff. In late February 1992, a co-employee overheard DeWitt telling Erekson that plaintiff "was starting to become a problem." When DeWitt and Erekson perceived that they had been overheard, "they turned away and got quiet."

On the afternoon of March 2, 1992, plaintiff and two other video department employees, Leavitt and Rowe, were working behind the video department counter. While Rowe was selling money orders to customers, Leavitt started to prepare a baggie containing $1,400 for deposit in the store safe, which was located in the video department. Plaintiff was

standing somewhere behind Leavitt. Before Leavitt dropped the money into the safe, Leavitt turned to help Rowe with money orders, leaving the money on the counter. When Leavitt finished helping Rowe, she discovered that the money was gone. Instead of becoming alarmed, Leavitt simply assumed that she had already dropped the money into the safe.

Later that night, another video department employee, Harper, discovered a baggie containing $1,400 in the bottom of a video department trash can that Harper was emptying. Harper told Leavitt of her discovery, and Leavitt instructed her to drop the money in the safe. Instead, Harper insisted that they inform an assistant manager about the money. The assistant manager then informed Erekson of the situation. In the meantime, Leavitt counted her till and discovered that the money Harper found was the same money that she thought she had dropped into the safe earlier in the day.

Erekson called defendant's president and told him that he suspected that plaintiff had hidden the cash in the trash can and intended to steal it. Erekson explained that he suspected plaintiff because she had instituted a trash policy in the video department, which prohibited evening shift employees from taking trash to the outside dumpster.[1] Instead, as a general practice, plaintiff would take out the previous night's trash when she arrived at work in the morning. Erekson told defendant's president that he believed plaintiff planned to steal the money when she took the trash to the dumpster the next day. The president told Erekson to call the police, and he did.

Deputy Januc of the Marion County Sheriff's Department went to the store that evening. After interviewing Leavitt, who denied having placed the money in the trash, Januc told Erekson that he did not consider her a suspect. Erekson then suggested that the money be put back into the trash can and that the police observe plaintiff's actions when she arrived at the store the next day. Januc agreed and

---

[1] Plaintiff testified that she instituted the policy to prevent encounters with transients near the dumpsters at night and because she wanted an opportunity to check the trash for money order receipts that might have been thrown away accidentally.

arranged to have another officer, Detective Stai, present to conduct the surveillance.

The next morning, as Stai watched, plaintiff arrived at work, went to the video department, and picked up a bag of trash to take to the dumpster. However, plaintiff picked up a different trash bag than the one containing the money. On her way to the dumpster, plaintiff went briefly into the women's restroom, taking the trash bag with her. She then went outside and placed the bag in the dumpster. On her way back into the store, Stai confronted plaintiff, identified himself, and asked if she would accompany him to the office to answer some questions.[2] Plaintiff replied that she would.

Stai, Erekson, and plaintiff then went into Erekson's office. Before Stai began questioning plaintiff, Erekson informed him that plaintiff had not taken the trash bag containing the money. Nonetheless, Stai informed plaintiff of her *Miranda* rights and began questioning her in Erekson's presence. Plaintiff, who was visibly nervous, denied having any involvement with the missing money. At some point during the interrogation, Stai asked Erekson if he should continue the questioning, and Erekson responded affirmatively. When Stai questioned plaintiff about a prior arrest that occurred 20 years earlier, plaintiff asked to have an attorney present. At that point, Stai stopped the interrogation, and plaintiff returned to the video department, where she called an attorney.

After plaintiff left, Stai told Erekson that he believed that plaintiff had attempted to steal the $1,400 and that "it was too bad there was a mixup on the garbage can." However, Stai's incident report expressed no opinion as to plaintiff's culpability. Later that morning, Erekson called plaintiff into his office and said, "In light of your calling a lawyer, you're terminated." Erekson subsequently printed on the company computer system that plaintiff had been fired for "dishonesty, mishandling of company funds, and performing acts which constitute a violation of the law, and tend to bring discredit to the company or harm employee morale" and showed plaintiff a printout.[3] Plaintiff was never prosecuted

---

[2] Stai apparently believed that plaintiff had taken the bag containing the cash.

[3] From this record, it is not apparent to what extent, if any, information "printed" on the computer system was accessible by other persons.

for attempted theft. After plaintiff's termination, Atkinson, the assistant manager, told Miller, one of defendant's employees, that plaintiff had been fired for stealing. Wolford, the checker, also told Wentz, a video department customer who asked about plaintiff's absence, that she "hated plaintiff" and was "glad she was gone" and that plaintiff had been fired for theft.

Plaintiff brought this action, alleging claims for wrongful discharge, breach of the implied covenant of good faith and fair dealing, breach of contract, defamation, "compelled self-publication" defamation,[4] intentional infliction of emotional distress, and invasion of privacy. Defendant moved to dismiss several of the claims for failure to state ultimate facts constituting claims under ORCP 21 A(8). In addition to asserting pleading defects under state law, defendant argued that plaintiff's employment was governed by a collective bargaining agreement and that, therefore, section 301 of the Labor Management Relations Act (LMRA), 29 USC § 185(a), preempted all but her defamation claims. The trial court rejected defendant's preemption argument but granted, pursuant to state law, defendant's motion to dismiss plaintiff's claims for wrongful discharge, invasion of privacy, and compelled self-publication defamation for failure to state a claim.

Defendant then moved for summary judgment against plaintiff's claims for breach of the implied covenant of good faith and fair dealing, breach of contract, defamation, and intentional infliction of emotional distress. Again, defendant asserted preemption under LMRA section 301 in addition to state law theories. Before filing her response to that motion, plaintiff moved to amend her complaint to include a claim for wrongful discharge based on the theory that she had been impermissibly fired in retaliation for her attempts to enforce the store anti-sexual harassment policy against fellow managers. The trial court denied plaintiff's motion to amend and granted defendant's motion for summary judgment:

---

[4] As amplified below, plaintiff's general defamation claim arises from defendant's publication of the allegedly false reasons for her discharge on its computer system and the subsequent publication of that information to other employees and customers. Plaintiff's compelled self-publication claim alleges that, because of defendant's conduct, she will be "compelled to communicate the false reasons for her termination to prospective employers."

"I think it boils down to the issues that the defense has raised; and that is, one, is there a collective bargaining agreement and can the court determine as a matter of law that there is. And I — I am disinclined to do that if I don't have to. But the alternative I think is as argued by the defense, you've either got a collective bargaining agreement or you don't. If you don't have a collective bargaining agreement, the evidence I think is undisputed you've got an at will employment relationship, and that means you can terminate it.

"* * * * *

"[I]t's the trial judge's responsibility to make a determination as to whether or not the conduct would be cognizable as outrageous enough to justify a separate cause of action. I do not feel that there's evidence in this case to support that kind of a conclusion. And for that reason, I don't think that as a matter of law that there is an intentional infliction claim in this case whether its preempted or not.

"The same thing is true of the defamation case. I think that's a skinny defamation case at best. And I think that in this case, if that was the sum total of the evidence, if I had all of this, I would not let it go to the jury."

Plaintiff alleges eight assignments of error. We reject, without discussion, the first, pertaining to the trial court's alleged failure to review certain materials and alleged bias, and proceed to the remaining seven.

In her second assignment, plaintiff asserts that the trial court erred in dismissing her claim for wrongful discharge. Plaintiff does not dispute the trial court's implicit assumption that she was an at-will employee. She argues, however, that, notwithstanding her at-will status, her termination was wrongful because a substantial factor in defendant's decision was "plaintiff's assertion of her employment related right to have an attorney at any time during any questioning by a law enforcement officer."

In *Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or App 371, 376, 879 P2d 1288 (1994), *rev dismissed* 321 Or 511 (1995), we recognized the two available grounds for a wrongful discharge claim:

"In general, an employer may discharge an employee at any time, for any reason, unless doing so violates a contractual, statutory or constitutional requirement. *Patton v. J. C.*

*Penney Co.*, 301 Or 117, 120, 719 P2d 854 (1986). There are exceptions to the general rule. A cause of action will lie against an employer who discharges an employee for performing a public duty, or fulfilling a societal obligation such as serving on a jury, *Nees v. Hocks*, 272 Or 210, 219, 536 P2d 512 (1975), or refusing to commit a potentially tortious act of defamation, *Delaney v. Taco Time Int'l*, 297 Or 10, 17, 681 P2d 114 (1984). An employer also may be held liable for discharging an employee for pursuing private statutory rights that are directly related to the employment, such as resisting sexual harassment by a supervisor, *Holien v. Sears, Roebuck and Co.*, 298 Or 76, 90-97, 689 P2d 1292 (1984), or filing a claim for workers' compensation benefits, *Brown v. Transcon Lines*, 284 Or 597, 588 P2d 1087 (1978)."

Plaintiff argues that the right to have an attorney present during police interrogation[5] arising from a work-related crime falls within the second, "pursuing private statutory rights that are directly related to employment" exception.[6] *Banaitis*, 129 Or App at 376. We disagree.

Unlike the right to be free from sexual harassment on the job or the right to file a workers' compensation claim, the right to counsel is not uniquely related to the employment relationship. It is a right that exists independently of a person's status as an employee. In that regard, *Campbell v. Ford Industries, Inc.*, 274 Or 243, 546 P2d 141 (1976), is instructive. In *Campbell*, the plaintiff, an employee and stockholder of defendant, claimed that he had been wrongfully terminated in retaliation for his demand to examine the defendant's corporate books. The Supreme Court affirmed the trial court's dismissal of the plaintiff's action:

"Although there may be reasons of public policy why the stockholders of a corporation should have the right to examine its books and records, the primary basis for that right is not one of public policy, but the private and proprietary interest of stockholders, as owners of the corporation." 274 Or at 249-50 (footnote omitted).

Like the right to inspect the corporate books, and unlike the right to pursue a workers' compensation claim or to challenge

---

[5] Plaintiff refers to the right to counsel secured by Article I, section 11, of the Oregon Constitution. Plaintiff does not refer to the right to counsel protected by the Sixth Amendment to the United States Constitution.

[6] Plaintiff did not attempt to invoke the "public duty" exception.

discrimination in the workplace, the right to counsel is not a right primarily and directly related to employment. Instead, its primary purpose is to protect an individual's penal interests *vis-a-vis* the state. Thus, the court did not err in dismissing plaintiff's wrongful discharge claim.

■ Plaintiff next assigns error to the dismissal of her allegations for compelled self-publication defamation. In her amended complaint, plaintiff alleged that defendant "could foresee that plaintiff would be compelled to communicate the false reasons [for her termination] to prospective employers" and that she "is compelled to communicate the false reasons for her termination to prospective employers to explain her sudden removal after such lengthy employment with defendant."

■ ■ Publication of a defamatory statement to a third party is an essential element of a defamation action. *State ex rel Advanced Dictating v. Dale*, 269 Or 242, 247, 524 P2d 1404 (1974). Generally, a defamer is not liable for a plaintiff's voluntary disclosure, *i.e.*, self-publication, of a defamatory statement to third parties; rather, the defendant must make the initial publication to a third party. *Restatement (Second) Torts* § 577, *comment m* (1977). However, courts have developed three exceptions to that anti-self-publication principle.

The first exception, the unknown disclosure exception, is embodied in *Restatement (Second) Torts*, § 577, *comment m*:

> "If the defamed person's transmission of the communication to the third person was made * * * without an awareness of the defamatory nature of the matter and if the circumstances indicated that communication to a third party would be likely, a publication may properly be held to have occurred."

The second exception is the compelled self-publication exception. Unlike the unknown disclosure exception, it does not require the plaintiff to be ignorant of the defamatory nature of the self-published communication. Rather, it provides that a self-publication will support an action for defamation if "the originator of the defamatory statement has reason to believe that the person defamed will be under a strong compulsion to disclose the contents of the defamatory statement to a third person." *McKinney v.*

*County of Santa Clara*, 110 Cal App 3d 787, 796, 168 Cal Rptr 89, 93-94 (1980).

The third exception, the general foreseeability exception, is a more expansive variant of the second. Although both are grounded, ultimately, in principles of foreseeability, the general foreseeability exception is not limited by notions of compulsion. Rather, under the third exception, a self-publication may be the basis of defamation liability, even absent compulsion, if the defendant knew or had reason to know that the defamatory material would come to the attention of third parties. *Neighbors v. Kirksville College of Osteopathic Medicine*, 694 SW2d 822, 824 (Mo Ct App 1985).

Here, plaintiff does not invoke the unknown disclosure or general foreseeability exceptions. Instead, she relies exclusively on compelled self-publication. She asserts, particularly, that Oregon has previously imposed liability for compelled self-publication defamation in *Lane v. Schilling*, 130 Or 119, 279 P 267 (1929).

In *Lane*, the plaintiff, who was blind, was a customer of the defendant bank. The bank knew that the plaintiff was blind and depended on his wife to read him his correspondence. A dispute arose between the plaintiff and the defendant, in which the plaintiff claimed the bank owed him money for the sale of some cattle. The plaintiff wrote the defendant "frequent and annoying" letters demanding the money. In response to the plaintiff's letters, the defendant's president, "in a fit of anger," wrote the plaintiff a letter in which he accused the plaintiff of "all sorts of dishonesties and unfair dealing, including actions criminal in their nature, and containing more than a dozen specifications of individual acts of dishonesty and bad faith." 130 Or at 121. When the plaintiff received the letter, his wife was not available to read it to him, so he had a friend do so instead. After hearing the contents of the letter from his friend, the plaintiff had his wife read the letter to him a second time.

The Supreme Court held that the plaintiff had stated a claim for defamation:

> "Defendant * * * knowing that plaintiff was blind and would necessarily be compelled to have his wife or somebody else read the letter to him, should have been more careful in

respect to the matters he stated in it, and should not have gone in any way beyond the absolute truth. To write a letter of this character, which plaintiff's wife would be compelled to read, and which [defendant] had every reason to believe that she would read, was going beyond anything that the law permits." *Id.* at 123-24.

We disagree with plaintiff that *Lane* recognized compelled self-publication defamation. Instead, both publications in that case — to the friend and to plaintiff's wife — fall within the unknown disclosure exception. At the time the plaintiff's friend read him the letter, the plaintiff was ignorant of the defamatory nature of the letter, and the defendant knew that the plaintiff would need a third party to read it to him. The court further concluded that, at the time the plaintiff asked his wife to reread the letter to him, he was still somewhat uncertain as to its exact content:

"We do not agree with counsel that the second reading of the letter by plaintiff's wife under the circumstances constituted a publication of libel by him. It would be only natural and prudent for a man in his blind condition, after having the letter read to him once, to give it a further reading in order to assure himself thoroughly of its contents * * *." *Id.* at 124.

Because *Lane* partakes of the unknown disclosure exception,[7] the availability of an action for compelled self-publication defamation presents a question of first impression under Oregon law. We note that roughly 20 other courts have considered the issue, with a slight majority recognizing the doctrine.[8]

---

[7] Our conclusion is buttressed by the fact that *Lane* served as the basis for illustration 10 to *Restatement (Second) Torts* § 577, *comment m*:

"A writes a defamatory letter about B and sends it to him through the mails in a sealed envelope. A knows that B is blind and that a member of his family will probably read the letter to him. B receives the letter and his wife reads it to him. A has published a libel."

[8] State courts have recognized compelled self-publication defamation in: *McKinney v. County of Santa Clara*, 110 Cal App 3d 787, 798, 168 Cal Rptr 89, 93-94 (1980); *Churchey v. Adolph Coors Co.*, 759 P2d 1336, 1343-45 (Colo 1988); *Colonial Stores, Inc. v. Barrett*, 73 Ga App 839, 841, 38 SE2d 306, 307-08 (1946); *Belcher v. Little*, 315 NW2d 734, 737-38 (Iowa 1982); *Grist v. Upjohn Company*, 16 Mich App 452, 485, 168 NW2d 389, 405-06 (1969); *Lewis v. Equitable Life Assur. Soc.*, 389 NW2d 876, 886-88 (Minn 1986); *Davis v. Askin's Retail Stores*, 211 NC 551, 554, 191 SE 33, 35 (1937); *Bretz v. Meyer*, 203 NE2d 665, 668-71 (Ohio 1963).

State courts have rejected compelled self-publication defamation in: *Gore v. Health-Tex, Inc.*, 567 So 2d 1307, 1309 (Ala 1990); *Layne v. Builders Plumbing*

*McKinney v. County of Santa Clara*, 110 Cal App 3d 787, 168 Cal Rptr 89 (1980), exemplifies the reasoning of courts that have recognized compelled self-publication defamation. There, the plaintiff was terminated from his job as a deputy sheriff for allegedly false reasons. He brought, *inter alia*, a defamation action against the defendant alleging that he had been compelled to republish the defamatory reasons for his termination during job interviews with other police departments. The trial court granted the defendant's motion to dismiss, and the California Court of Appeals reversed:

> "The rationale for making the originator of a defamatory statement liable for its foreseeable republication is the strong causal link between the actions of the originator and the damage caused by the republication. This causal link is no less strong where the foreseeable republication is made by the person defamed operating under a strong compulsion to republish the defamatory statement and the circumstances which create the strong compulsion are known to the originator of the defamatory statement at the time he communicates it to the person defamed." 110 Cal App 3d at 797-98, 168 Cal Rptr at 94.

*See also Churchey v. Adolph Coors Co.*, 759 P2d 1336, 1344 (Colo 1988) (quoting *McKinney*); *Belcher v. Little*, 315 NW2d 734, 738 (Iowa 1982) (same); *Lewis v. Equitable Life Assur. Soc.*, 389 NW2d 876, 888 (Minn 1986) (same).

*Layne v. Builders Plumbing Supply Co*, 210 Ill App 3d 966, 569 NE2d 1104 (1991), is representative of the contrary view:

> "We believe that recognition of a cause of action for compelled self-defamation * * * might discourage plaintiffs from mitigating damages. Rather, the availability of

---

*Supply Co.*, 210 Ill App 3d 966, 976, 569 NE2d 1104, 1111 (1991); *Weintraub v. Phillips, Nizer, et al.*, 172 App Div 2d 254, 255, 568 NYS2d 84, 85 (1991); *Yetter v. Ward Trucking Corp.*, 401 Pa Super 467, 585 A2d 1022 (1991); *Doe v. Smithkline Beecham Corp.*, 855 SW2d 248, 259 (Tex App 1993), *aff'd on other grounds*, 903 SW2d 347 (Tex 1995); *Lunz v. Nueman*, 48 Wash 2d 26, 290 P2d 697 (1955).

Federal courts exercising diversity jurisdiction appear less inclined to determine, in the first instance, that their forum states would recognize compelled self-publication defamation. *See Hensley v. Armstrong World Industries, Inc.*, 798 F Supp 653, 657 (WD Okla 1992) (incorrectly concluding that "the vast majority of states considering the issue reject it"); *De Leon v. St. Joseph Hosp., Inc.*, 871 F2d 1229, 1237 (4th Cir), *cert den* 493 US 825 (1989); *Sarratore v. Longview Van Corp.*, 666 F Supp 1257 (ND Ind 1987). *But see Elmore v. Shell Oil Co.*, 733 F Supp 544 (EDNY 1988); *Polson v. Davis*, 635 F Supp 1130, 1147 (D Kan 1986).

increased damages from such a claim might encourage publication of a defamatory statement by a plaintiff who reasonably could have avoided such republication or could have tried to explain to a prospective employer the true nature of the situation and to contradict the defamatory statement. Moreover, the only way an employer could seemingly avoid litigation and the possible liability for substantial damages * * * would be to deter from communicating to an employee, as well as to a third person, the reason the employer felt justified in terminating employment. Both employers and employees have significant interest in open communication about job-related problems. Further, it is in the public interest that information regarding an employee's discharge be readily available to the discharged employee and to prospective employers. * * * In our opinion, the doctrine of compelled self-defamation unduly burdens the free communication of views and unreasonably broadens the scope of defamation liability. 210 Ill App 3d at 976; 569 NE2d at 1111.

■ On balance, we are persuaded by the reasoning of those courts that have recognized compelled self-publication defamation. Accordingly, we hold that a claim for such defamation in the employment context is cognizable under Oregon law subject to the constraints set out below. We do so for two reasons. First, an employer who knowingly or recklessly makes false statements about a former employee to that person's prospective employer can be liable for defamation. *Cooper v. PGE*, 110 Or App 581, 590, 824 P2d 1152, *rev den* 313 Or 209 (1992). We see no reason why an employer who knowingly or recklessly gives an employee a defamatory reason for his or her discharge, when it is reasonably foreseeable that the employee will be under a strong compulsion to disclose that reason to putative employers, should be treated any differently. Causation and harm in both instances are the same. To impose liability in the first, but not the second, would elevate form over substance; it would permit employers to achieve indirectly that which they cannot do directly.

■ Second, as noted in *McKinney*, a defendant who makes defamatory statements to a third party is liable not only for that publication, but also for the third party's reasonably foreseeable republication of those statements to others. Again, subject to appropriate limitations described below, we see no reason why the same principle should not apply equally

"where the foreseeable republication is made by the person defamed operating under a strong compulsion to republish the defamatory statement and the circumstances that create the strong compulsion are known to the originator of the defamatory statement at the time he communicates it to the person defamed." *McKinney*, 110 Cal App 3d at 797-98, 168 Cal Rptr at 94. Again, causation and harm in both instances are the same.

We acknowledge the concerns expressed in *Layne* and other contrary authority, but we believe that they can be adequately mitigated with proper limitations. For example, *Layne* anticipates that disgruntled discharged employees could unilaterally create causes of action merely by republishing defamatory matter. However, the very nature of the claim, which requires plaintiffs to prove that they were under a *strong compulsion* to divulge the defamatory matter, alleviates that concern. *Lewis*, 389 NW2d at 888; *Belcher*, 315 NW2d at 738. We note, moreover, that, as a practical matter, there are substantial disincentives against gratuitous self-publication in the employment context. A party who engages in gratuitous self-publication to prospective employers not only risks not recovering on a compelled self-publication claim, but also risks not being hired.

*Layne's* concern that compelled self-publication defamation will subject employers to unprecedented liability and chill candid communication regarding the reasons for discharge has already been addressed under Oregon law. In *Walsh v. Consolidated Freightways*, 278 Or 347, 355, 563 P2d 1205 (1977), the court recognized that a "former employer has a qualified privilege to make defamatory comments about the character or conduct of his employees to present or prospective employers."[9] As the Minnesota Supreme Court has held, that qualified privilege necessarily applies to an employer's communication to a former employee:

> "[T]he logic of imposing liability upon a former employer in a self-publication case appears to compel recognition of a qualified privilege. A former employer in a compelled self-publication case may be held liable as if it had actually published the defamatory statement directly to prospective

---

[9] The scope and limitations of an employer's qualified privilege are discussed below. 137 Or App at 135.

employers. Where an employer would be entitled to a privilege if it had actually published the statement, it makes little sense to deny the privilege where the identical communication is made to identical third parties with the only difference being the mode of publication." *Lewis*, 389 NW2d at 890.

*See also Churchey*, 759 P2d at 1346.

■     Thus, we conclude that a plaintiff may assert a claim for compelled self-publication defamation in the employment context when: (1) the defendant employer makes a defamatory statement to the plaintiff employee; (2) it was reasonably foreseeable to the defendant that the plaintiff would be under a strong compulsion to disclose the content of that statement to prospective employers; (3) the plaintiff, *under compulsion*, communicates the defamatory statement to a prospective employer; and (4) because of that communication, the plaintiff was damaged. We conclude, moreover, that the defendant's communication to the plaintiff, which underlies such a cause of action, is subject to the qualified privilege described in *Walsh*.

Here, plaintiff sufficiently pleaded the first two elements, but did not allege that she had, under compulsion, actually republished the alleged defamatory material to prospective employers, much less that she had been injured as a result of that republication. However, defendant's motion to dismiss under ORCP 21 A(8) did not raise or rely on those deficiencies. Defendant did not contest the particulars of plaintiff's pleadings but, instead, simply argued that compelled self-publication defamation was not cognizable under Oregon law. The trial court, faced with a question of first impression, accepted defendant's brightline proposition and decided that question differently than we do. Accordingly, we reverse and remand the dismissal of plaintiff's allegations for compelled self-publication defamation. *See Hendgen v. Forest Grove Community Hospital*, 98 Or App 675, 678, 780 P2d 779 (1989).

■     In her fourth assignment of error, plaintiff alleges that the trial court erred in dismissing her claim for invasion of privacy based on Stai's "coercive interrogation." We conclude that the trial court did not err in dismissing that claim, because plaintiff's pleadings disclose that she initially consented to the interrogation and that, when Stai raised

"personal questions," she asked to talk to a lawyer and did so. There is no allegation in the pleadings that the interrogation continued after plaintiff expressed reluctance to answer further questions. Accordingly, plaintiff failed to state a claim. *Leggett v. First Interstate Bank of Oregon*, 86 Or App 523, 528, 739 P2d 1083 (1987).

■　Plaintiff next assigns error to the trial court's allowance of summary judgment against her claim for breach of the implied covenant of good faith and fair dealing. In her amended complaint, plaintiff pleaded that defendant's conduct in *terminating* her employment constituted a breach of the duty of good faith. However, Oregon law has never extended the duty of good faith and fair dealing "to at-will employment contracts, insofar as the right to discharge at-will is concerned." *Sheets v. Knight*, 308 Or 220, 233, 779 P2d 1000 (1989). Accordingly, summary judgment was proper.

Plaintiff's sixth assignment of error asserts that the trial court erred in granting summary judgment against her "standard" defamation claim, pleaded as the third claim of the first amended complaint. That claim arose from three similar, and arguably related, publications by defendant's employees to the effect that plaintiff had been fired for dishonesty involving mishandling of company funds. The first was the store manager, Erekson's, publication on the company computer that plaintiff had been fired for "dishonesty, mishandling of company funds, and performing acts which constitute a violation of the law, and tend to bring discredit to the company or harm employee morale."[10] The second publication involved substantially similar statements by Atkinson, the assistant manager, to Miller, a coemployee.[11] The third involved substantially similar statements by Wolford, the checker, to Wentz, a customer.

In seeking summary judgment, defendant argued that the first and second publications were intramural communications by managers and were, thus, insulated from

---

[10] Although plaintiff does not allege to whom that publication was made, defendant does not dispute that publication occurred.

[11] On appeal, plaintiff argues that defendant should be liable for a produce manager's republication of the allegedly defamatory reasons for plaintiff's termination to Don Thing, a produce clerk. However, plaintiff failed to plead that communication as a basis for liability, and we decline to consider it.

liability by a qualified privilege. Defendant further, and separately, argued that it could not be liable for the communication from Wolford to Wentz, because Wolford was acting beyond the scope of her employment.[12] Plaintiff responded that there are genuine issues of material fact both as to whether Erekson and Atkinson abused the qualified privilege and as to whether Wolford was acting within the scope of her employment when she communicated with Wentz. The trial court concluded that both issues were susceptible to summary judgment and entered judgment for defendant.

We first address the application of the qualified privilege to Erekson's and Atkinson's publications and, particularly, whether there were disputed factual issues concerning abuse of the qualified privilege. An employer has a qualified privilege to make a defamatory statement about a former employee to current employees 'if the statements were intended to protect employee morale. *Bickford v. Tektronix, Inc.*, 116 Or App 547, 551, 842 P2d 432 (1992). After the privilege is properly raised, plaintiff has the burden of proving that it has been abused. In particular, the qualified privilege is extinguished on a showing that the defaming employer lacked a "belief *or* reasonable grounds for the belief in the truth of the defamatory matter." *Cooper v. PGE*, 110 Or App 581, 590, 824 P2d 1152, *rev den* 313 Or 209 (1992) (emphasis supplied).[13] Thus, the test is disjunctive: The qualified privilege is deemed abused either if the defendant lacked objectively reasonable grounds for its statement or if the defendant did not, in fact, believe the statement to be true.

Here, defendant asserts that, with respect to Erekson's and Atkinson's intramural statements, the qualified privilege applies because it "had ample reason to inform its employees why plaintiff was discharged in order to make clear that it does not tolerate employee theft." Plaintiff does not argue that the qualified privilege is generally inapplicable, but contends that there is a genuine issue of fact as to

---

[12] Defendant does not argue that Erekson and Atkinson were not acting in the scope of employment.

[13] In *Cooper*, the court noted that, under Oregon law, "a qualified privilege, as a general proposition, may be abused in four ways." 110 Or App at 590. The remaining three are not apposite to this appeal.

whether defendant abused the privilege because Erekson and Atkinson either lacked an objectively reasonable basis for, or a subjective belief in, their statements.

We conclude that there is no disputed issue of fact as to whether Erekson and Atkinson, acting as defendant's agents, had objectively reasonable grounds for stating that plaintiff had engaged in dishonest conduct involving company funds. Those grounds include: (1) Objective evidence, as confirmed by the police, that $1,400 of store funds had been placed in the video department's trash can intentionally and not accidentally. That evidence included the location of the trash can, in relation to the counter, and the placement of the plastic bag containing the cash in the middle of the trash, rather than on top of it. (2) Plaintiff had instituted a trash policy, under which she, and not other employees, was responsible for disposing of the trash. (3) Plaintiff and Leavitt were the only two employees in close proximity to the plastic bag containing the $1,400 at the time it disappeared. (4) Under defendant's in-house accounting systems, the $1,400 could be and, in fact, was, easily and immediately traceable to Leavitt. (5) The police interviewed Leavitt and found her denial of involvement to be credible. (6) After interviewing plaintiff, Stai told Erekson that he believed plaintiff had attempted to steal the funds. Those facts are undisputed, and plaintiff adduced no other evidence from which a trier of fact could reasonably conclude that defendant, through Erekson and Atkinson, lacked an objectively reasonable basis for believing the truth of the allegedly defamatory statements. Consequently, the first objective test was satisfied.

We turn, then, to whether there was a factual dispute concerning Erekson's and Atkinson's actual belief, which would, in turn, preclude summary judgment based on the qualified privilege. Plaintiff argues that, even if Erekson and Atkinson had an objectively reasonable basis for stating that she had engaged in dishonest conduct, including attempted theft, they did not actually believe that their statements were true. Instead, she asserts, they made those statements to justify terminating her so that she would not "blow the whistle" on Atkinson, DeWitt, Wolford, and Fowlds' violations of the company's "anti-fraternization" policy. Plaintiff

contends that such an inference is reasonably supported by evidence that: (1) Violation of the "anti-fraternization" policy was a serious matter that could result in discipline, and particularly, termination. (2) Less than a month before Erekson fired her, plaintiff had confronted Erekson's social friends DeWitt and Wolford about their violations of the "anti-fraternization" policy. (3) Erekson's social friends Atkinson and Fowlds were also violating the policy. (4) Less than two weeks before plaintiff was discharged, a disinterested party overhead DeWitt telling Erekson that plaintiff "was starting to become a problem." In plaintiff's view, that inference creates a disputed issue of material fact as to Erekson's and Atkinson's actual belief.

We agree. Although Erekson and Atkinson testified that they believed that plaintiff had attempted to steal company funds, plaintiff adduced evidence disputing their credibility. Plaintiff did not rely on a mere inference of "flat disbelief." *Tolbert v. First National Bank*, 312 Or 485, 495, 823 P2d 965 (1991). Instead, she presented "specific facts" demonstrating, by plausible inference, that Erekson and Atkinson had substantial interest and motivation to fabricate reasons for her termination and to do so in such a way that her own "whistle-blowing" allegations would be completely discredited. *Accord To v. State Farm Mutual Ins.*, 319 Or 93, 104-05, 873 P2d 1072 (1994). The question of Erekson's and Atkinson's credibility and, hence, of their subjective belief, was not susceptible to summary judgment. *See Taal v. Union Pacific Railroad Co.*, 106 Or App 488, 494, 809 P2d 104 (1991) ("Credibility questions are for the factfinder; they are not for the court to resolve in dealing with contradictory evidence in a summary judgment setting.").[14] Thus, the court erred in granting summary judgment against plaintiff's noncompelled defamation claim.

Finally, with respect to defamation, we conclude that the summary judgment record established, as a matter of

---

[14] *Accord* 10A Wright, Miller & Kane, *Federal Practice & Procedure* § 2730 at 238 (issues of subjective intent and motivation are generally not susceptible to summary judgment pursuant to FRCP 56). *Cf. Elbeshbeshy v. Franklin Institute*, 618 F Supp 170, 172 (ED Pa 1985) (plaintiff's proof that she had been terminated for reasons of "professional jealousy," rather than "lack of cooperation" as employer stated, precluded summary judgment on employer's qualified privilege defense to defamation claim).

uncontroverted fact, that Wolford was not acting within the scope of her employment when she made the allegedly defamatory statement to Wentz. An employee acts within the scope of employment when: the act occurs "substantially within the time and space limits authorized by the employment"; "the employee was motivated, at least partially, by a purpose to serve the employer"; and "the act is of a kind the employee was hired to perform." *Chesterman v. Barmon*, 305 Or 439, 442, 753 P2d 404 (1988). Here, it is undisputed that Wolford was a cashier-level employee and that she made the allegedly defamatory statement while at work. However, defendant's evidence established that Wolford, as a cashier, had no authority to make statements regarding defendant's supervisory-level personnel decisions, much less to the public. Plaintiff did not controvert that proof. Consequently, the trial court correctly determined that defendant could not be liable for Wolford's alleged statement to Wentz.[15]

■ Plaintiff's seventh assignment of error asserts that the trial court should not have granted summary judgment against her claim for intentional infliction of emotional distress (IIED). Plaintiff's amended complaint alleges that "defendant's conduct in requesting and continuing [Stai's] abusive interrogation" of plaintiff constituted IIED. Plaintiff argues that Erekson "procured the police to his store, without either a reasonable belief or probable cause," "asked the police to interrogate [plaintiff] even after knowing that plaintiff did not take the money," and "asked the police to continue the interrogation after the money incident had been addressed."[16]

In granting defendant's motion for summary judgment against plaintiff's IIED claim, the court stated:

"[I]t's the trial judge's responsibility to make a determination as to whether or not the conduct would be cognizable as outrageous enough to justify a separate cause of action. I do

---

[15] Defendant also argues that, under *Wright v. Dollar General Corp.*, 602 So 2d 772, 775 (La App 1992), Wolford's statement to Wentz was protected by a qualified privilege. *Wright* is inapposite. There, the third parties to whom the allegedly defamatory matter was published were law enforcement personnel consulted during the course of a theft investigation, not customers.

[16] Plaintiff did not, and does not, argue that Erekson initiated the police investigation against her because of her past, and potential, attempts to enforce the anti-sexual harassment policy against his friends.

not feel that there's evidence in this case to support that kind of a conclusion. And for that reason, I don't think that as a matter of law that there is an intentional infliction claim in this case * * *."

On appeal, plaintiff invokes *Dalby v. Sisters of Providence*, 125 Or App 149, 865 P2d 391 (1993), and *Woods v. First American Title Ins. Co.*, 102 Or App 343, 794 P2d 454, *mod* 104 Or App 100, 798 P2d 1121 (1990), *rev den* 311 Or 151 (1991), as demonstrating that her IIED claims should have been submitted to a jury. Those cases are, however, materially distinguishable.

In *Dalby*, the plaintiff, a pharmacy technician, brought an action against the defendant pharmacy for wrongful discharge and intentional infliction of emotional distress. She alleged that, after she brought to the defendant's attention that its inventory record-keeping system violated provisions of the Oregon Administrative Rules, the defendant instituted a campaign of harassment calculated to force her to leave her job. The plaintiff alleged that the defendant falsely accused her of stealing cocaine, caused the sheriff to investigate her on that charge, and asked the sheriff to arrest her. The plaintiff was never charged with a crime. The trial court dismissed her IIED claim under ORCP 21 A(8), and we reversed, holding that the plaintiff's allegations would support a cause of action for IIED. 125 Or App at 155.

In *Woods*, the plaintiff brought an action for intentional infliction of emotional distress against her former employer. The plaintiff alleged that the defendant launched a campaign of harassment after a breakdown in negotiations regarding her purchase of a controlling interest in the defendant. She alleged that, after her termination, she returned to her office to gather her personal items, but the office manager informed her that all her possessions had been packed in a box. The plaintiff further alleged that her possessions had not been packed in a box and that, when she began gathering items from her office, the office manager accused her of theft and persuaded a police officer to investigate the matter on an unofficial basis. The plaintiff further alleged that the police officer subsequently appeared at her home on a Saturday evening and threatened to arrest her. The trial court dismissed the plaintiff's IIED claim for failure to state ultimate

facts constituting a claim, ORCP 21 A(8), and again we reversed, holding that, when considered in their totality, plaintiff's pleadings sufficiently alleged a claim for IIED. 102 Or App at 348.

The operative facts, as pleaded in *Dalby* and *Woods*, are substantively distinguishable from those presented here. In both of those cases, there were disputed issues of fact as to whether crimes had even taken place. Here, it is undisputed that someone had attempted to steal $1,400 and that Erekson believed that a crime, or attempted crime, had occurred when he contacted the police. Moreover, unlike the plaintiffs in *Dalby* and *Woods* who asserted that the defendants' accusations of criminal conduct and instigation of criminal investigations were retaliatory, plaintiff does not argue, with reference to her IIED claim, that Erekson targeted her for a police investigation because she had attempted to enforce the anti-sexual harassment policy. Nor did Erekson's role in initiating or prompting police action rise to the level of that alleged in *Dalby* and *Woods*. For example, it is uncontroverted that Stai elected to question plaintiff even after Erekson informed him that plaintiff had not taken the trash bag containing the money.[17] Finally, the police conduct in this case was not nearly so intense or confrontational as in *Dalby* or *Woods*. Here, there were no requests for arrest or threats of arrest. The police did not visit plaintiff at her home. Instead, plaintiff's interaction with the police was limited to the single interrogation by Stai, to which she consented, and which she terminated when she decided the questions were becoming too intrusive. Thus, the trial court properly granted summary judgment against plaintiff's IIED claim.

■ Finally, plaintiff asserts that the trial court erroneously denied her motion to amend her amended complaint to include a claim for wrongful discharge, alleging she was fired because of her efforts to enforce the anti-sexual harassment policy. The trial court explained, "I don't think it's appropriate to do it within 30 days of trial date of a case that is now a couple of years old." Given the age of the case and the

_____

[17] The only evidence suggesting that Erekson took an active role in the investigation is that, at some point during the interrogation, Stai asked him if he wanted the questioning continued, and Erekson responded affirmatively. That response was unexceptionable.

proximity of the trial date, we conclude that the trial court did not abuse its discretion in denying leave to amend. *See Jackson Co. v. Jackson Education Serv. Dist.*, 90 Or App 299, 303, 752 P2d 1224, *rev den* 306 Or 155 (1988).

Judgment on defamation claims reversed and remanded; otherwise affirmed.