BRETZ *v.* MAYER.*

[Cite as Bretz v. Mayer, 1 Ohio Misc. 59.]

---

*Affirmed by Court of Appeals (No. 26687) on February 8, 1964. Dismissed for want of prosecution by Supreme Court (No. 39033) on January 11, 1965.

60

(No. 720748—Decided May 20, 1963.)

ACTION FOR LIBEL: Common Pleas Court for Cuyahoga County.

*Mr. Alfred L. Steuer*, for plaintiff.
*Messrs. Snyder, Neff & Chamberlain, Mr. Owen C. Neff*, for defendant.

HODDINOTT, J. (sitting by assignment from Monroe County). The jury in this libel action returned a verdict of $2,500 for the plaintiff, Emil Bretz. The defendant, Louis Mayer, moved alternatively for judgment notwithstanding the verdict or for a new trial.

Bretz, a man now in his late fifties, was born in Hungary. He received a theological education and served as an ordained Baptist minister there until middle life. In 1948, he came to the United States to assume the pastorate of the Shaker Square Hungarian Baptist Church in Cleveland, Ohio. He is now a citizen of this country.

Defendant, Louis Mayer, a practicing attorney in Cleveland, was born in the United States and is of Hungarian extraction. He had been an active member of the Shaker Square church for nine years before Bretz came. Some three years later, in 1951, he withdrew his membership after disputes with Bretz over church policies, and joined another church in which he became active.

When the Hungarian revolution against the Communists failed, Bretz became busy day and night arranging for refugees to come to this country. Some of them lived temporarily in his home until they could find employment and permanent residences. Many of them remained in Cleveland and became members of his church.

A schism developed between the new arrivals and the other members who were a generation or two removed from the old country. The former look upon Bretz as a man of sterling Christian virtues, a loving pastor who gave unstintingly of his money, time and energy in religious work. The original group came to feel that he was grossly neglecting his ministry to them.

They criticized him for slowness in mastering English so that he could preach in that language. They said he was dictatorial and endlessly conniving to have his way. One witness said he was a psychopathic personality; others testified they would not believe him under oath. Many of this group left the church in protest.

Bretz was also criticized for his marital difficulties. While still living in Hungary, he had married an American woman considerably younger than himself. Serious differences existed between them for several years, and in May 1958, she received a divorce which Bretz did not contest. Three months later, he married his present wife who then was still in her teens.

There was no evidence of an illicit affair before the divorce; in fact, there appears to have been hardly any courtship at all. The present Mrs. Bretz testified that during her early youth she was miraculously cured of migraine headaches after Bretz had prayed with her several times at church. She looked upon him almost with awe. Her family were all active in the church and she served as organist and in other capacities. After the divorce, Bretz was physically and emotionally downcast, and she was full of pity for him, she said. Then, much in the old world manner, Bretz talked with her parents about marriage, and shortly afterwards they were married by another Baptist minister.

Because of his divorce and early remarriage, Bretz was suspended from membership in the Hungarian Baptist Union, an association of about fifteen ministers of that denomination. Later, action was taken to expel him from the Shaker Square church membership, to take effect retroactively.

In December 1958, the Hungarian Bethany Church was founded under the auspices of the American Council of Christian Churches, and Bretz became its pastor.

A month later, the defendant wrote this letter to Bretz:

"Mr. Emil Bretz                          January 20, 1959
10016 Lamont Avenue
Cleveland 6, Ohio

"Dear Mr. Bretz:

"This letter is written to you at the request and instructions of many people, too numerous to mention.

"The happening of events makes it regrettable that this action becomes necessary and that notice to you must be given in the nature of a demand.

"You are herein reminded that you were expelled from the Hungarian Baptist Union of America and that likewise you were expelled as a member and minister of Shaker Square Hungarian Baptist Church. Those acts constitute a suspension of yourself from all ministerial privileges heretofore available to you.

"There remain other serious acts which will require justification by you and will be taken up in due time, certainly in the very near future.

"It has been brought to our attention that you are intending to solicit funds through an appeal to persons and churches. We are further informed that it is your intention to organize a group of people into a church of which you will be the minister.

"Due to your status, your reputation, and events which cloud your character, the following demands are made upon you:

"1. Refrain from soliciting any funds whatsoever unless they are for a recognized agency or organization.

"2. Refrain from organizing any group of which you would act as minister, counselor or advisor.

"3. Refrain from molesting or annoying any religious group or groups in which you were formerly a member.

"4. Make preparations for an accounting of all funds which were collected by you or under your direction for all periods since you entered the United States.

"5. Discontinue the use of the little [sic] 'Reverend.'

"There is a dual approach to these demands—One in a christian spirit and one in a legal capacity. There is overwhelming support for these demands from all groups of people, especially ministers. These issues have received careful consideration by a legal committee and unless you comply with the herein demands, the following actions will be filed against you in the Court of Common Pleas:

"1. A restraining order from collecting or soliciting funds of any kind whatsoever.

"2. A restraining order from organizing any church whatsoever and an order restraining your using the title of 'Reverend.'

"In connection with funds collected by you in the past, you are requested to prepare an accounting within 30 days from the receipt of this letter. Refusal to comply shall then necessitate immediate legal action.

"This action is engendered by the chaos brought about as a result of your conduct; past, present, and anticipated. All of the issues involved are problems in which this community has an interest. There is an abundance of legal authority to support our views so that we go forth with supreme confidence.

"It was said in 1662 by Thomas Brooks, 'Truth is mighty and will prevail.' We repeat that quotation in 1959 without altering its significance.

"At the risk of being repetitious, I again state that this action is dictated by a large class of people who have certain definite inalienable rights. Those rights shall be protected.

> "Very truly yours,
> "Louis R. Mayer."

The defendant testified that he wrote this letter at the request of several persons including the former Mrs. Bretz and a Hungarian Baptist minister. It was sealed in an envelope addressed to Bretz and sent by registered mail. Bretz showed the letter to several members of the small group seeking to form the new church. One of them translated it into Hungarian so that some of the rest could read it.

Some of the members left the new church because of the letter. There was testimony that the American Council of Christian Churches has held off granting a building loan to the church until the matters in the letter are cleared up. Through the years the new church has struggled along with never more than twenty members. The plaintiff has conducted weekly services to the present. The church has never been able to pay him a salary, and Bretz has a full-time position as guard at the Cleveland Art Museum to support himself.

No action seeking an injunction or an accounting, or any other sort of legal action, has been brought against Bretz by the persons represented by defendant or anyone else.

Part of the court's instruction to the jury is as follows:

"Before damages can be awarded in a libel suit, it is necessary that the libel be published. The word 'publish' as I have

used it has a special legal meaning. It means simply that the defamatory material must have been seen or heard by one or more persons other than the author and the subject of the libel. The reason is that a libel action contemplates, not compensation for wounded feelings alone, but rather damages for impairment of one's reputation with others. There is no publication sufficient for legal liability where libellous matter is sent to the person libelled, unless the sender intends or has reason to suppose that the matter will reach third persons, or such result naturally follows from the sending.

"The dictation of the letter to his secretary by Mayer was not publication because she stood in a confidential relationship to him.

"The first disputed issue of fact, ladies and gentlemen, for you to decide is this:

"At the time Louis Mayer sent Exhibit 1 to Emil Bretz, did Mayer intend or have reason to suppose that the letter would be shown or read to third persons, or that such a result naturally would follow the sending?"

In the cases there is some confusion over the meaning of the word *publication*. This opinion will use the concept found in Harper & James, The Law of Torts (1956), Section 5.15:

". . . if the idea is communicated to the person defamed only, there is no publication and consequently the plaintiff's interest in his reputation has not been invaded. 'The basis of the action is damages for injury to the character in the opinion of others. This cannot arise but from publication.' " (Citing *Lyle* v. *Clason*, 1 Caines 581, 583 [N. Y. 1804].)

Thus, publication is merely the communication of the libel to some person other than the one libeled—by either defendant or plaintiff.

Eminent legal authorities recognize that there are exceptions to the general rule that plaintiff cannot recover for libel when it is contained in a letter mailed by defendant to the plaintiff.

Thus Harper & James, *supra*, in Section 5.15, state:

". . . If the person sending a libelous statement through the mails addressed to the person defamed has reason to believe that it will be read by third persons, as a matter of course, and if such third person does open and read it as anticipated,

there has been a publication. It is a question for the jury whether the defendant had reason to believe a third person would read the letter. But ordinarily if the person himself showed the letter to a third person or read it to such third person, he has himself to thank for the publication and cannot recover from the person who wrote the letter.''

And *Prosser on Torts* (1941) 814, Section 93, has this to say:

''Ordinarily the defendant is not liable for a publication to others by the plaintiff himself; but in a few cases where, because of the plaintiff's blindness or immaturity, it was reasonably to be anticipated that he would seek assistance, the writer of a libelous letter has been held responsible.'' (Citing *Lane* v. *Schilling, Hedgpeth* v. *Coleman, Davis* v. *Askin's Retail Stores, Inc.*, all *infra.*)

The first of the two exceptions to the general rule is where the defendant has reason to believe the letter containing the libel will fall into the hands of a third person *before* the plaintiff reads or is informed of its contents.

In *Rumney* v. *Worthley* (1904), 186 Mass. 144, 71 N. E. 316, the first paragraph of the syllabus reads:

''Where defendant sent libelous letters to plaintiff, having good reason to believe that they were likely to be opened by an authorized person other than plaintiff, his sending them by mail was a publication.''

And in *Lane* v. *Schilling* (1929), 130 Ore. 119, 279 P. 267, 65 A. L. R. 1042, Headnote No. 3 (65 A. L. R. 1042) says:

''A letter containing matter defamatory of the person to whom it was addressed, which, by reason of the addressee's blindness, the writer had reason to believe would be read to him by the addressee's wife, is actionable if it destroyed or weakened her confidence in her husband's integrity to such an extent as to cause him mental anguish or loss of consortium.''

The second exception to the general rule, and the one with which the case at bar is concerned, is where the defendant has reason to believe that the plaintiff will be under strong compulsion to show the libelous letter to third persons after he has read it.

In *Hedgpeth* v. *Coleman* (1922), 183 N. C. 309, 111 S. E. 517, 24 A. L. R. 232, headnote No. 1 (24 A. L. R. 232) reads:

"One sending a sealed letter to a fourteen-year-old boy is guilty of libel if he shows the letter to relatives, where it threatened him with imprisonment, since the sender has reasonable ground to know that the letter will be seen by a third person, and his act is the proximate cause of the publication.

The opinion states, 24 A. L. R., at 235:

". . . the defendant argued that . . . there was no publication by him, because the paper was communicated directly to the plaintiff, and the plaintiff alone divulged the contents. We have stated the general rule to be that the communication of libelous matter to the person defamed does not of itself constitute a publication. The defendant's argument involves the question whether the rule is inflexible or whether it is subject to exception or qualification. The suggestion that as a principle it is immutable cannot be adopted. The ultimate concern is the relation that existed between the writing of the paper and the disclosure of its contents by the plaintiff. For running through the entire law of tort is the principle that a causal relation must exist between the damage complained of and the act which occasions the damage. Unless such relation exists, the damage is held to be remote, and cannot be recovered; but, if such relation does exist, the wrongful act is held to be the cause of the damage. So, in this case, we cannot disregard the relation of cause and effect."

In *Davis* v. *Askin's Retail Stores, Inc.* (1937), 211 N. C. 551, 191 S. E. 33, Case Note: 22 Minn. L. Rev. 571, paragraph 3 of the syllabus is as follows:

"In action for libel, allegation that plaintiff, an inexperienced youth, believed he was threatened with prosecution for criminal offense and consulted others and exhibited alleged libelous communication to them, and that defendant knew that plaintiff by reason of his youth would divulge contents of letter to others, sufficiently charged that defendants were responsible for publication of libelous letter."

Paragraph 1 of the syllabus of *Stevens* v. *Haering's Grocetorium*, 125 Wash. 404, 216 P. 870, provides:

"The principle that defendant in slander suit is not liable for damages for dissemination of defamatory statements caused by plaintiff herself, *held* inapplicable, where, from the nature of the charges, the harsh manner of making them, the time,

place, and circumstances, plaintiff as a natural result became hysterical and said and did things which were the product of plaintiff's action rather than of her own volition."

The following syllabus is found in *Colonial Stores, Inc.* v. *Barrett* (1946) 73 Ga. App. 839, 38 S. E. 2d 306:

"3. The printing of a libel is regarded as publication thereof when possession of printed matter is delivered to person libeled with expectation that it will be read by some third person and such result actually follows.

"4. Whether general rule that libel is published when communicated to any person other than party libeled extends to disclosure by such party to third person depends on causal relationship between libel and publication.

"5. A libelous communication, sent to person libeled, may be published, where sender intends or has reason to suppose that it will reach third person, which happens or naturally follows from sending, particularly where disclosure thereof by person libeled arises from necessity."

The above case is concerned with a War Manpower Commission certificate of availability in which it was stated that plaintiff had been discharged from employment with defendant because of improper conduct toward fellow employees. Defendant delivered it to plaintiff who was required to show it to prospective employers.

The law which applies to all the cases which have been discussed is well stated in 1 Street, Foundations of Legal Liability, page 296:

"There is no publication such as to give rise to a civil action where libelous matter is sent to the person libeled, unless the sender intends or has reason to suppose that the matter will reach third persons (which in fact happens) or such result naturally follows from the sending."

In the case at bar, defendant had reason to suppose that the letter would reach third persons, such result following naturally from the sending. The letter from Mayer to Bretz contains not only a personal libel, but also a very real threat to the existence of the new church. It was Bretz's duty as pastor to reveal the imminent danger to the church's officials. Bretz was a man, transplanted in a strange land in middle life, having difficulty with the language, at low physical and emotional ebb

because of church disputes and his marital difficulties, and feeling painfully responsible to the church he was forming. It was patently inevitable that he would reveal the letter to such persons as he did.

The situation was entirely different in *Konkle* v. *Haven* (1905), 140 Mich. 472, 103 N. W. 850, cited by Mayer in his brief. In that case, the plaintiff, a minister, had accepted a call to another church. The defamatory letter was written to the board of elders who had hired him. Under the law, that communication was privileged. The board, exercising good sense, kept silent about the letter and sent it to the minister. After further investigation, the pastor was allowed to enter upon his duties. During his last sermon at the old church, and months after the letter was written, the minister read it to the congregation. The case properly held he could not recover for damages arising from his own defiant act.

Judgment for the defendant notwithstanding the verdict would be improper in the case at bar. "It is a question for the jury whether the defendant had reason to believe a third person would read the letter." Harper & James, The Law of Torts, Section 5.15, *supra*. In *Rumney* v. *Worthley, supra*, the second paragraph of the syllabus states:

"In an action for sending libelous letters through the mail, which were opened by plaintiff's daughter, evidence examined, and *held* sufficient to justify an inference that defendant had knowledge that the letters might be so opened; requiring submission of that question to the jury."

The first branch of defendant's motion should be overruled.

In support of his motion's second branch, for a new trial, defendant urges:

1. Defendant should have been allowed to amend his answer to set up truth of the libel as an affirmative defense.

2. Defendant cannot recover for words written about him as a clergyman unless he was in fact engaged in that profession at the time.

1. Section 2739.02, Revised Code, provides that truth as a defense shall be specially pleaded:

"In an action for a libel or a slander, the defendant may allege and prove the truth of the matter charged as defamatory.

Proof of the truth thereof shall be a complete defense. In all such actions any mitigating circumstances may be proved to reduce damages."

The long-established law in Ohio as to truth as a defense is well stated in 34 Ohio Jurisprudence 2d, Libel and Slander 303, Section 143:

"It has long been the settled rule, and recognized in the trial practice in such cases, that a justification cannot be proved under a general denial in a libel or slander action. Where the testimony proposed to be offered can have no other effect than to make apparent the guilt of the plaintiff, and to prove the truth of the words spoken, thereby necessarily tending to justify the speaking of the words and not merely to mitigate damages, the facts relied on and proposed to be offered in evidence must be specially pleaded, and cannot be permitted to go in evidence under a general denial. So, truth *as a defense* must be specially pleaded. But even though not thus specially pleaded, the authorities support the rule that truth can nevertheless be shown under a general denial, not as a defense, but for the purpose of mitigating the damages * * *."

The court's charge to the jury in the case at bar contained an instruction about truth being considered in mitigation of damages.

2. The argument that plaintiff was not a practicing clergyman at the time of the libel is simply not supported by the evidence. That he had to provide a living for his wife and himself from secular employment does not alter the fact that his principal concern was to lead the struggling young church where he preached every Sunday. In fact, defendant's letter demands that he refrain from organizing a church and soliciting funds.

*Motion overruled.*