## Bryan Nadeau v. Imtec, Inc. and Michael Hilgert

[670 A.2d 841]

No. 94-373

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed November 22, 1995

Motion for Reargument Denied as Untimely Filed December 19, 1995

*Gwendolyn W. Harris* of *Kiewel & Harris, P.C.*, Brattleboro, for Plaintiff-Appellee.

*J. Scott Cameron* of *Paterson & Walke, P.C.*, Montpelier, for Defendants-Appellants.

**Johnson, J.** Defendants appeal from a jury verdict awarding plaintiff damages for wrongful discharge. Defendants appeal the trial court's denial of motions for directed verdict and for judgment notwithstanding the verdict, arguing that they are entitled to judgment as a matter of law on four grounds: (1) that plaintiff was not terminated, but resigned voluntarily; (2) that plaintiff was an at-will employee; (3) that, if he were not an at-will employee, defendants had just cause to dismiss plaintiff; and (4) that the after-acquired-evidence doctrine bars any recovery by the plaintiff. We reverse, holding that defendants had just cause as a matter of law to terminate plaintiff's employment, and that the trial court erred in denying the motion for a directed verdict.[1]

## I.

The material facts in this case are undisputed. Defendant Imtec, Inc. hired plaintiff as service technician in January 1990. At that time, plaintiff signed an employment agreement setting out the terms of his employment. A year later, in January 1991, plaintiff began a consensual romantic affair with a married co-worker. This relationship lasted until May of the same year. Plaintiff claims that the relationship ended by mutual decision, while the co-worker testified that she

---

[1] Defendants raise a number of issues on appeal, any one of which could be dispositive. For the purposes of this opinion, we assume without deciding that defendants discharged plaintiff. Because we reverse the judgment below, we need not reach defendants' after-acquired-evidence argument. We also need not reach defendants' additional claims with respect to the jury instruction on mental anguish and the qualification of plaintiff's financial expert.

ended the relationship. A short time after the relationship ended, plaintiff was promoted to manager. While he did not directly supervise the co-worker, the trial court found that he occupied a superior position, and had the ability to control or influence her work activities. Both the co-worker and another Imtec employee testified that plaintiff refused to accept the end of the relationship, professing his love for the co-worker and repeatedly asking her to have sex with him. Plaintiff himself admitted asking the co-worker to have sex after their relationship had ended.

August of 1991, the co-worker attempted to return to plaintiff the letters and gifts he had given her. Plaintiff refused to accept the items. Later that day, plaintiff wrote a letter to the co-worker on work time and left it in her car, which was parked in the company lot. The co-worker's husband, who came to pick up their child's car seat, discovered the letter and learned of the affair. The co-worker, who was quite upset, missed work the following Monday, and on Tuesday informed her supervisor, defendant Michael Hilgert, that her husband wanted her to resign. When questioned, she explained her problems with plaintiff. She and Hilgert agreed that plaintiff's supervisors would speak to him and ensure that his personal attentions toward her stopped.

Hilgert spoke to plaintiff, who admitted the incident but maintained that the co-worker continued to approach him in a personal manner. Hilgert concluded that plaintiff's actions constituted sexual harassment and scheduled another meeting with plaintiff. At this meeting, Hilgert informed plaintiff of Imtec's policy on sexual harassment and told him that Imtec would not tolerate such conduct. Hilgert gave plaintiff a written warning, which specifically stated that "any future valid complaints of harassment would result in termination" and required plaintiff to "limit his contact with [the co-worker] to work related tasks."

After receiving this written warning, plaintiff continued to involve himself in the co-worker's personal life. In one incident, plaintiff sought out the co-worker, found her taking a cigarette break, and criticized her for smoking. Although plaintiff testified that he sought out the co-worker because he needed help with a customer, he also admitted that he mentioned his own personal problem with the co-worker's smoking habit. At this time, Hilgert again told plaintiff to limit his contact with the co-worker to work-related tasks. Another Imtec employee testified that plaintiff sought her help in convincing the co-worker to leave her husband. Plaintiff testified that the co-worker refused to accept several gifts from him during this period, including a fake diamond, lingerie, and a Christmas present.

On December 18, plaintiff gave the co-worker a letter, at work, which began, "I'm sorry but I can't accept 'no' right now," and went on to discuss his feelings for her. The letter upset the co-worker, who tore it up. Another employee noticed that she was crying and informed Hilgert. The co-worker taped the letter together, gave a copy to Hilgert, and told him of her continuing problems with plaintiff.

After this meeting between Hilgert and the co-worker, Imtec's management team met, discussed the problem, consulted counsel, and considered several alternatives, such as transferring plaintiff. Management decided that, if the allegations were true, terminating plaintiff's employment was their only option, although they did decide to offer plaintiff the opportunity to resign. The next day, Hilgert called plaintiff, who was on vacation, and asked him to come to the office for a meeting that afternoon.

At the meeting with Hilgert and another member of Imtec management, plaintiff first denied having disobeyed the order to limit his contact with the co-worker to work-related tasks. When confronted with the December 18 letter, however, plaintiff admitted that he had written the letter and given it to the co-worker.

Hilgert then offered plaintiff a choice: he could either resign, and receive certain benefits, such as a reference and severance pay, or he would be terminated. Plaintiff chose to resign, and signed a resignation letter, effective that day. Plaintiff later wrote two letters of apology, one to the co-worker and one addressed to several Imtec managers. Although in the letter to the co-worker plaintiff stated that he had "no defense" for his actions, and expressed contrition and regret for his behavior, he later testified that he had lied in the letter in hopes of gaining the co-worker's help in getting his job back.

In April 1992, plaintiff filed a four-count complaint against defendants, alleging defamation, sex discrimination, breach of employment contract (wrongful discharge), and intentional infliction of emotional distress. Defendants moved for summary judgment, which was granted with respect to defendant Hilgert on the sex discrimination count, but denied on all other counts. Defendants then moved for directed verdict at the close of plaintiff's case, and renewed the motion at the close of all the evidence. Plaintiff withdrew the defamation and intentional infliction of emotional distress counts, and the trial court denied the motion for directed verdict on the wrongful discharge and sex discrimination claims.

The jury, which had been instructed that plaintiff could be discharged only for just cause, found for defendants on the sex discrim-

ination count, but awarded plaintiff $175,000 damages on the wrongful discharge claim. Defendants made several post-judgment motions, including a motion for judgment notwithstanding the verdict, which were denied. This appeal followed.

## II.

Review of both a motion for directed verdict and a motion for judgment notwithstanding the verdict raises the same question, namely "whether the result reached by the jury is sound in law on the evidence produced." *Foote v. Simmonds Precision Products Co.*, 158 Vt. 566, 570, 613 A.2d 1277, 1279 (1992). On appeal, we consider the evidence "in the light most favorable to the nonmoving party and exclude the effect of any modifying evidence." *Id.* "If any evidence fairly or reasonably supported a lawful theory of the plaintiff," then we must uphold the trial court's denial of the motion for directed verdict. *Id.*

The trial court concluded as a matter of law that defendants could discharge plaintiff only for just cause. Defendants contend that plaintiff was an at-will employee, who could be discharged at any time, for any reason. We need not reach this issue. Under his own theory of the case, plaintiff could be discharged only for just cause. Because we hold that defendants had just cause as a matter of law for plaintiff's discharge, we do not resolve the conflict about the applicable standard.

Our precedents define just cause for termination of employment as "some substantial shortcoming detrimental to the employer's interests, which the law and a sound public opinion recognize as a good cause" for dismissal. *In re Brooks*, 135 Vt. 563, 568, 382 A.2d 204, 207 (1977); accord *In re Gorruso*, 150 Vt. 139, 147, 549 A.2d 631, 636 (1988). To be upheld, a discharge for just cause must meet two criteria: first, that the employee's conduct was egregious enough that the discharge was reasonable, and second, that the employee had fair notice, express or implied, that such conduct could result in discharge. *Gorruso*, 150 Vt. at 146, 549 A.2d at 636; *Brooks*, 135 Vt. at 568, 382 A.2d at 207-08.

Plaintiff does not deny committing any of the acts for which his employment was terminated. Nor does plaintiff argue that the reason given for his discharge was a mere pretext for some other impermissible or illegal reason. See *Ainsworth v. Franklin County Cheese Corp.*, 156 Vt. 325, 330-31, 592 A.2d 871, 874 (1991) (sufficient evidence

for jury finding that reason given for termination was pretext to avoid severance allowance). His only claim is that his attentions toward the co-worker were welcome, and therefore cannot be characterized as sexual harassment. This claim is inconsistent with plaintiff's own testimony (for example, plaintiff admits that the co-worker rejected his gifts), and contradicted by other undisputed evidence, including the wording of the December letter ("I can't accept '*no*' right now" (emphasis added)). Moreover, plaintiff produced no evidence other than his own testimony to support this claim. We are not persuaded that, on these facts, plaintiff's unsupported allegation that his attentions were welcome is sufficient to "fairly or reasonably support" his claim that he did not sexually harass his co-worker.

Regardless of plaintiff's interpretation of the legal significance of his conduct, the undisputed facts in this case establish that defendants had just cause to terminate plaintiff's employment. Defendants, concerned at the very least about a disruptive affair in the workplace with the looming possibility of sexual harassment, gave plaintiff a specific, written order to limit his contact with a particular co-worker to work-related tasks. The order was a reasonable attempt to prevent present unrest and any future conduct that might be construed as sexual harassment (and might expose defendants to liability under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, or Vermont's Fair Employment Practices Act, 21 V.S.A. § 495). Plaintiff admits that he disobeyed this order on more than one occasion. Disobedience of such an order is unquestionably substantially detrimental to defendants' interests in maintaining a workplace free of discrimination and in avoiding financial liability. The United States Supreme Court has recently reaffirmed an employer's obligation to prevent sexually harassing conduct that results in a hostile or abusive work environment. See *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22, 114 S. Ct. 367, 371 (1993) (holding that sexually harassing conduct in workplace violates Title VII where it would reasonably be perceived, and is perceived, as abusive); see also *Gorruso*, 150 Vt. at 147, 549 A.2d at 636 (grievant's repeated sexual harassment clearly a "substantial shortcoming detrimental to the State's interest").

Even if we viewed plaintiff's theory of the case as plausible, his admitted disobedience of a reasonable order aimed at preventing sexually harassing behavior was sufficiently egregious, as a matter of law, to serve as grounds for discharge. A different result would undermine the strong public policy supporting, and even requiring, attempts by employers to prevent sexual harassment. The first

criteria for just cause is met, leaving only the question of whether plaintiff had fair notice that the conduct would result in discharge.

Again, the undisputed evidence indicates that plaintiff had notice that disobeying the order to limit his conduct with the co-worker to work-related tasks might result in discharge. The memorandum that contained the order also characterized plaintiff's meeting with Hilgert as a "major warning," and stated that "future valid complaints of harassment would result in termination."[2] Plaintiff himself testified that Hilgert told him after the smoking incident that plaintiff would be fired if he was unable to act professionally. Plaintiff cannot reasonably maintain that he was unaware that conduct such as writing a personal letter to the co-worker and giving it to her at work would result in discharge.

Plaintiff argues that, because defendants told plaintiff he was being fired for sexually harassing a co-worker, defendants altered the terms of plaintiff's employment contract such that plaintiff could be fired only for sexual harassment. Following this reasoning, if plaintiff's conduct did not amount to sexual harassment, he could not be fired, even though his conduct was just cause for discharge. We see no merit in this argument. A contract is not created or modified when an employer states a reason for an employee's discharge. Adopting this reasoning would discourage employers from explaining their reasons for discharging employees, a result which is inconsistent with sound public policy.

*Reversed.*

---

[2] Plaintiff contends that there were no valid complaints of sexual harassment. The written warning and plaintiff's own testimony indicate, however, that defendants believed that plaintiff's past conduct constituted sexual harassment, and that future nonwork-related contact with the co-worker during work hours would also constitute sexual harassment. Plaintiff testified that he was aware, after the August meeting and warning, of defendants' position on sexual harassment. On these facts, plaintiff had notice that disobeying the order to limit his contact with the co-worker to work-related tasks could result in discharge.