David RAYMOND, Plaintiff,

v.

INTERNATIONAL BUSINESS
MACHINES CORP.,
Defendant.

No. 2:95–CV–158.

United States District Court,
D. Vermont.

Jan. 27, 1997.

James Wayland Runcie, Ouimette & Runcie, Vergennes, VT, for plaintiff.

Heather Briggs, Downs, Rachlin & Martin, P.C., Burlington, VT, for defendant.

### OPINION AND ORDER

SESSIONS, District Judge.

David Raymond brings this action against his former employer, International Business Machines Corporation ("IBM"), alleging breach of an employment contract and defamation in connection with his discharge from employment. Jurisdiction is based on diversity. IBM has moved for summary judgment on Raymond's claims. For the reasons that follow, IBM's motion is DENIED.

### Factual Background

For the purpose of this summary judgment motion, the Court assumes the following facts are true. David Raymond worked for IBM from 1978 to November 1, 1993. He worked the night shift in equipment maintenance. In September or October of 1993, Raymond was concerned about several issues over which he disagreed with his manager, Paul Luneau. He had some concerns about safety, and he was upset that another employee had been allowed to go on day shift ahead of him. He took these concerns to Luneau's manager, Michael Wilson, in accordance with IBM's "Open Door" policy. Through this policy, an employee may request a review by higher management of his or her manager's actions.

In October 1993, a fellow employee, Lloyd Bachand, reported to Luneau that he had heard that Raymond and another worker had broken into Luneau's office some months before and read confidential personnel files. Luneau discussed the matter with Wilson, and Peter Potts of the Human Resources department. Luneau began an investigation of the allegation. As part of his investigation, Luneau interviewed Robert Howard, the co-worker accused of breaking into Luneau's office with Raymond. Howard told Luneau that he had accompanied Raymond

to Luneau's office, where Raymond unlocked Luneau's credenza, removed personnel files and read them. Howard admitted reading his own personnel file.

Raymond was on vacation at the time the accusation was made and the investigation undertaken. Upon his return, Luneau confronted Raymond, and asked him if he had seen confidential material in his credenza. Raymond said no. Luneau then told Raymond he was fired. Luneau told Raymond that someone had accused him, but refused to identify the individual. Raymond asked, "Who was it, Bob Howard?" Luneau did not respond.

Raymond had an exit interview with personnel advisor Potts. Raymond was upset, and wanted to know how he could appeal the decision to fire him. Potts gave him some information about how he could appeal. Raymond told Potts that he had not done what he was accused of doing. Raymond also asked if he could work as a vendor. Potts said that at present IBM would probably not allow him back in to work as a vendor, but probably would in the future.

On his way home after being discharged, Raymond stopped at Howard's house. He wanted to find out whether Howard knew anything about why he was fired. Howard told him that he had told Luneau that Raymond had seen the confidential material.

Raymond requested a review of his discharge with the senior site executive, Doug Grose, through IBM's Open Door policy. Grose appointed an Open Door investigator to review the situation. The investigator concluded that management had made the right decision. Based on the investigation results, Grose upheld the management's decision to discharge Raymond.

On May 24, 1995, Raymond filed this action against IBM, alleging breach of contract in that IBM fired him without just cause (Count I); that it fired him in retaliation for his use of the Open Door procedure to question his working conditions (Count II); and that it fired him without a reasonable investigation of the accusation, and without a reasonable appeal process (Count III).[1] He also alleged that IBM is liable for defamation under the doctrine of compelled self-publication (Count IV). IBM moved for summary judgment on all counts on March 29, 1996.

*Discussion*

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986), citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970).

Unless there is sufficient evidence to enable a jury to return a verdict in favor of the nonmoving party, "there is no issue for trial. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (citations omitted).

I. Breach of Contract—Just Cause Termination (Count I)

Raymond claims that the IBM employee handbook, "About Your Company," contained language which modified the at-will employment relationship and created a contract requiring good cause for termination. He also asserts that IBM had a company-wide policy that employees would only be fired for just cause, and that more than one manager communicated this policy to him. IBM insists that Raymond was an at-will employee, and argues that, assuming that good cause was required for termination, IBM had good cause to fire Raymond.

In Vermont, employment for an indefinite period is presumed to be employment at will, "terminable at any time, for any

---

1. Raymond subsequently withdrew Count III.

reason or for none at all."[2] *Sherman v. Rutland Hosp., Inc.*, 146 Vt. 204, 207, 500 A.2d 230 (1985). *See also McKenny v. John V. Carr & Son, Inc.*, 922 F.Supp. 967, 974 (D.Vt.1996). This presumption may be rebutted by evidence indicating that the employer expressly or by clear implication foreclosed its right to terminate except for cause. *Id.*, citing *Benoir v. Ethan Allen, Inc.*, 147 Vt. 268, 270, 514 A.2d 716 (1986).

■■■ At-will employment contracts may be modified by express agreement, statute, public policy, the personnel policies or practices of the employer, and actions or communications by the employer reflecting assurances of continued employment. *Foote v. Simmonds Precision Products Co.*, 158 Vt. 566, 570–71, 613 A.2d 1277 (1992); *McKenny*, 922 F.Supp. at 975 (citing *Benoir*, 147 Vt. at 270, 514 A.2d 716; *Ploof v. Brooks Drug, Inc.*, Civ. No. 89–270, 1991 WL 497170 (D.Vt. Aug. 28, 1991)). An employer may unilaterally modify an employee's at-will status by adopting written company policies that are inconsistent with that status. *McKenny*, 922 F.Supp. at 977 (citing *Taylor v. National Life Ins. Co.*, 161 Vt. 457, 464, 652 A.2d 466, 471 (1993)).

■■■ Whether a handbook's provisions have established contractual rights will usually be a question for the jury. *Farnum v. Brattleboro Retreat*, — Vt. —, —, 671 A.2d 1249, 1254 (1995); *Taylor*, 161 Vt. at 465, 652 A.2d 466. *See also Mecier v. Branon*, 930 F.Supp. 165, 169 (D.Vt.1996); *Clement v. Woodstock Resort Corp.*, No. 95–375, 1996 WL 627371 (Vt. Oct. 10, 1996). Only if the evidence would not permit a reasonable jury to find that the handbook modified an at-will employment will summary judgment be appropriate. *See Madden v. Omega Optical, Inc.*, — Vt. —, —, 683 A.2d 386, 389 (1996).

The parties have submitted evidence of five editions of IBM's handbook, issued in 1981, 1984, 1989, May 1993, and August 1993. In 1981, the handbook contained the following section, quoted in pertinent part:

*Termination of Employment.* Such termination may be initiated by an employee or by management. If you initiate the separation, it is considered a voluntary resignation....

Separation can also be initiated by management if an employee's performance fails to meet IBM standards or in such circumstances as serious misconduct or violation of company policy.

In 1984, the same section appeared in substantially similar form:

*Termination of Employment.* IBM has not established any specific term of employment; therefore, termination may be initiated at any time by either an employee or by management. If you initiate the separation, it is considered a voluntary resignation....

Separation can also be initiated by management if an employee fails to meet IBM's performance, punctuality or attendance standards, or if an employee engages in misconduct or violates a company policy.

In 1989, the same section appeared as follows, making clear that the listed reasons warranting discharge were not exclusive of other reasons:

*Termination of Employment.* IBM has not established any specific term of employment; therefore, termination may be initiated at any time by either an employee or by management. If you initiate the separation, it is considered a voluntary resignation....

Separation may also be initiated by management. Reasons for separation may include, but are not limited to: failing to meet IBM's performance, punctuality or attendance standards, engaging in misconduct or violating a company policy.

At 176. In another section of the handbook, entitled "Employee Conduct Guidelines," the employee was advised that "IBM has developed some specific policies and guidelines relating to employee conduct. If you engage in misconduct or violate a company policy, you are subject to disciplinary measures, which may include immediate termination of

---

**2.** Because this case is brought under diversity jurisdiction, Vermont law applies to all substantive issues. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

employment." There followed a list of "guidelines." At 177.

In May 1993 sections of the handbook were revised and made available online to employees. The "Termination of Employment" section was one of those revised:

> *Termination of Employment.* IBM and its units have not established any specific term of employment. The employment relationship is at will and can be ended at any time with or without cause. Termination may be initiated by either an employee or by management. If you initiate the separation, it is considered a voluntary resignation. . . .
>
> Separation can also be initiated by management. Reasons for separation may include, but are not limited to: failing to meet performance, punctuality or attendance standards; engaging in misconduct or violating an IBM or unit policy; a need to resolve resource surpluses; or incompatibility between business needs and employee skills.

At 6. In August 1993, sections of the handbook were revised again and distributed online, but the "Termination of Employment" section was not altered. Both 1993 revisions contained a new section entitled "Employment Security," in which this language appeared: "Employment at IBM may be ended by the employee or IBM at any time for any reason. This is called employment at-will." At 2.

In *Farnum v. Brattleboro Retreat,* the Supreme Court of Vermont considered the effect of multiple editions of an employee handbook. In this wrongful discharge from employment case, three handbooks were admitted into evidence, from 1982, 1986 and 1988. The two later handbooks contained explicit disclaimers of any modification of the employee's at-will status. Noting that the provisions in the handbooks sent mixed messages regarding whether employees can be discharged without cause, the Court held that the disclaimers must be evaluated "in the context of all the other provisions in the handbooks and any other circumstances bearing on the status of the employment agreement." —— Vt. at ——, ——, 671 A.2d at 1254, 1255.

The handbooks in *Farnum v. Brattleboro Retreat,* however, provided for a system of progressive discipline in most cases of employee performance problems or violations of company rules. —— Vt. at ——, 671 A.2d at 1253. IBM's employee handbooks do not contain any specific reference to a disciplinary policy. IBM contends that there are therefore no mixed messages in the successive handbooks, and no reason to consider the earlier editions.

■ At most, the IBM handbooks collectively impart that there are "disciplinary measures," short of termination of employment, to which an employee may be subject if he or she misbehaves. A policy, to be enforceable, must be "definitive in form, communicated to the employees, and demonstrate an objective manifestation of the employer's intent to bind itself." *Ross v. Times Mirror, Inc.,* 164 Vt. 13, ——, 665 A.2d 580, 584 (1995). Without more, the bare allusion to disciplinary measures in the handbooks does not permit a rational factfinder to conclude that the at-will employment relationship has been modified.

■ *Farnum* nonetheless counsels evaluation of the handbooks in their entirety, and in light of any other circumstances bearing on the status of the employment agreement. —— Vt. at ——, 671 A.2d at 1255. Taking the evidence in the light most favorable to the nonmoving party, those circumstances are as follows.

■ First, the language in the "Termination of Employment" sections of the 1981 and 1984 handbooks, supplying a comprehensive list of reasons for management-initiated termination, could allow the reasonable factfinder to conclude that an IBM employee could only be discharged for those particular reasons, or "cause." Second, the modifications to the language of this section over the course of eleven years were gradual and inconspicuous. Although an employer may change a policy of discharge-for-cause, the employee must be given reasonable notice of the change. *Farnum,* —— Vt. at ——, 671 A.2d at 1254, citing *In re Certified Question,* 432 Mich. 438, 443 N.W.2d 112, 113 (1989). If a jury were to find that the early hand-

books were evidence of a policy of discharge only for cause, then whether changes made to the handbooks provided reasonable notice to employees that the policy had been changed would also be a jury question. *Farnum*, —— Vt. at ——, 671 A.2d at 1254.

Finally, and most significantly, Raymond has submitted deposition testimony from three individuals employed by IBM in a managerial capacity suggesting that there is a company-wide policy of just cause termination. Michael Wilson, Raymond's manager's manager, testified that he understood that a manager at IBM must have a good reason to fire an employee. He stated further:

> Q Were you ever aware of IBM telling employees that they could be fired for any reason or for no reason at all in IBM's discretion?
>
> A No, I am not aware of any discussion along those lines.
>
> Q Is it your understanding, though, that employees won't be fired from IBM unless business conditions require it or their performance is not what it should be or they're guilty of some misconduct?
>
> A I would have to say that we would not fire anybody if we had no reason to fire anybody. I mean, it is poor human relations to do that.

Wilson Dep. at 27, 31 (paper 22, att. 3).

Peter Potts, an IBM personnel advisor with more than 30 years of experience in the organization, responded in a deposition as follows:

> Q Is a manager supposed to have any specific grounds for terminating an employee?
>
> A Yes.
>
> Q Like what?
>
> \* \* \* \* \* \*
>
> A If an individual is stealing, ... or is doing things that are immoral, unethical, or if their performance ... has deteriorated and has continued to deteriorate after ... counseling, they can fire them for a variety of things.
>
> Q Is a manager supposed to have a good reason to fire an employee?

> A Yes.
>
> Q Okay. Does the manager have to justify the termination of an employee to someone else?
>
> A Yes.
>
> Q To whom?
>
> A Their management.
>
> Q Okay. A manager can't fire an employee because he doesn't personally like the employee?
>
> A No.
>
> \* \* \* \* \* \*
>
> Q Okay. Your understanding is that it's IBM policy that a manager needs to have a reason to fire someone; is that right?
>
> A Yes.
>
> Q If a manager just felt he couldn't get along with an employee who was otherwise functioning satisfactorily, could the manager fire the employee?
>
> A No.
>
> \* \* \* \* \* \*
>
> Q Are the managers told that they need to have a legitimate reason to fire someone?
>
> A Yes.

Potts Dep. at 28–29, 43 (paper 32, att. 4).

John O'Kane, Team Leader of Human Resources at IBM, testified as follows:

> Q Any termination by a manager has to have an objective basis, is that correct, justification?
>
> A Yes, it should.
>
> Q A manager has to have a good reason to fire someone?
>
> A Yes, he should.
>
> Q In your experience at IBM, has this understanding, or in your experience at IBM, has the need to have a justification for any firing been communicated to employees?
>
> A No.
>
> Q In the 17 years you have been in human resources, are you aware of any instances in which managers have told employees either at meetings or individually that, "You are not going to be fired at IBM

unless there is a good reason for it," or something to that effect?

A Managers may very well have made some statement like that.

Q Are you aware of any effort by IBM to communicate that idea to employees?

A Only to the extent we communicate to our employees as to our intent to be a fair employer.

Q . . . do you know whether at any time it has been generally understood by employees that they are not going to be terminated unless either their performance is not up to what it should be or they commit some misconduct?

A Many employees would probably have that perception based on their observations of what they would probably perceive to be fair treatment.

O'Kane Dep. at 24–26 (paper 38, att. 1).

■ Evaluating the handbooks in their entirety, and considering the deposition testimony as some evidence of a company-wide policy of just cause termination, Raymond has sustained his burden of demonstrating that there are material issues of fact for the jury as to whether the at-will employment relationship had been modified, and whether IBM effectively disclaimed any implied contract for just cause termination.

■ IBM has argued that it is nevertheless entitled to summary judgment even assuming Raymond had a contract for just cause termination, because it had reasonable grounds to believe that Raymond had engaged in conduct supplying good cause for his discharge. Raymond has responded that whether IBM had just cause to discharge him is a question for the jury to determine.

The Vermont Supreme Court has not addressed the issue of whether courts should defer to an employer's determination that it had good cause to discharge an employee when the employee denies the conduct. *See Farnum,* —— Vt. at ——, 671 A.2d at 1255, n. 1. In *Nadeau v. Imtec, Inc.,* decided the same day as *Farnum,* the Court reversed a jury award for plaintiff on his wrongful discharge claim, holding that to be upheld, a discharge for just cause must be based on conduct sufficiently egregious that discharge

was reasonable, and must be preceded by fair notice that such conduct could result in discharge. —— Vt. ——, ——, 670 A.2d 841, 844 (1995). The plaintiff in *Nadeau,* however, admitted that he committed the acts for which he was fired. The Court simply held that as a matter of law the admitted conduct constituted just cause for discharge. *Id.* at ——, 670 A.2d at 845.

The recently decided case of *Clement v. Woodstock Resort Corp.* affords some guidance as to how the Vermont Supreme Court may rule on this issue when it is squarely presented to it. On appeal from a jury verdict awarding plaintiff damages for wrongful discharge, the defendant argued that even if just cause was required for termination, it had just cause. At trial plaintiff denied that he had engaged in some of the misconduct alleged, and challenged whether the conduct that he admitted justified immediate termination. In upholding the jury verdict, the Court held that there was credible evidence upon which the jury could have reasonably determined that the plaintiff's conduct did not justify immediate termination. *Clement v. Woodstock Resort Corp.,* No. 95–375, 1996 WL 627371, at \*2 (Vt. Oct. 10, 1996). The Court at least implicitly approved of a jury determination of whether the misconduct in fact occurred, and whether it justified the sanction imposed.

In *Ainsworth v. Franklin County Cheese Corp.,* the Vermont Supreme Court similarly approved a jury determination of the true reason for plaintiff's dismissal from employment, where the employer's motive for the firing was in dispute. 156 Vt. 325, 330, 592 A.2d 871, 874 (1991).

In its opinions dealing with wrongful discharge issues, the Vermont Supreme Court has relied frequently on the leading case of *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 292 N.W.2d 880 (1980). *See Farnum,* —— Vt. at ——, 671 A.2d at 1254; *Ross,* 164 Vt. at —— ——, 665 A.2d at 584–85; *Taylor,* 161 Vt. at 464–65, 652 A.2d 466; *Foote,* 158 Vt. at 570, 613 A.2d 1277; *Ainsworth,* 156 Vt. at 330, 592 A.2d 871. In *Toussaint,* the Michigan Supreme Court discussed the role of the jury when a former

employee has challenged a for-cause termination. In cases where the employer claims that the employee was discharged for specific misconduct, and the employee claims that he did not do what was alleged, "the question is one of fact for the jury: did the employee do what the employer said he did?" 292 N.W.2d at 896.

Although *Toussaint* has more frequently been cited by the Vermont Supreme Court in its analyses of whether an at-will employment relationship has been modified, in *Ainsworth* the Court specifically relied on language from *Toussaint* to approve allowing the jury to decide whether the reason given by the employer was the true reason for discharging the employee. 156 Vt. at 330, 592 A.2d 871. It is highly probable that the Vermont Supreme Court would adopt *Toussaint*'s reasoning as well in cases where the employee denies the conduct alleged.[3]

IBM claimed that Raymond was fired because he broke into Luneau's office and read confidential personnel files. Raymond has maintained that he did not do this. Assuming that Raymond can establish that he had a contract for just cause termination, the question of whether the misconduct occurred is one of fact for the jury. Accordingly, Defendant's Motion for Summary Judgment as to Count I is denied.

## II. Breach of Contract—Retaliatory Discharge (Count II)

 Count II alleges that Raymond was fired because he exercised his rights to complain about or question working conditions under IBM's Open Door Policy. IBM contends that it did not fire Raymond in retaliation for making a safety complaint, but for rifling through confidential personnel files. As a threshold matter, moreover, IBM argues that claims of retaliation for complaining about working conditions are within the exclusive jurisdiction of the National Labor Relations Board, and that Count II is preempted by the National Labor Relations Act ("NLRA").

According to the NLRA, it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." 29 U.S.C. § 158(a)(1) (1973 and Supp.1996). Section 157 provides, in relevant part, that employees shall have the right "to engage in ... concerted activities for ... mutual aid or protection." 29 U.S.C. § 157 (1973). Raymond argues that his claim is not preempted by the NLRA, because he acted alone, and thus did not engage in "concerted activity." Furthermore, he alleges that he was retaliated against not only for a safety complaint, but for a complaint about his supervisor's personnel decisions.

In *Ewing v. NLRB*, 768 F.2d 51 (2d Cir. 1985), the Second Circuit discussed the evolution of the interpretation of the phrase "concerted activity" under the NLRA. The Second Circuit held that it was possible that an individual's safety complaint was sufficiently related to the activities of fellow employees to be considered concerted activity. *Id.* at 55.

Under *Ewing* and the cases discussed therein, "concerted activity" is to be construed to allow the NLRB some latitude in policing unfair labor practices. "Since a literal reading is not required, the Board may find a lack of concerted activity in 'personal gripe' cases such as *Ontario Knife*, but find concerted activity where an individual seeks to protect his own and his co-employees' statutory rights and to improve the terms and conditions of employment." *Id.* at 56 (citation omitted).[4] However, in the instant

---

3. The Court notes that other jurisdictions have rejected *Toussaint*'s reasoning, and concluded that judicial review of good or just cause for termination is limited to whether the employer reasonably and in good faith believed that the conduct giving rise to termination occurred. *See, e.g., Cotran v. Rollins Hudig Hall Int'l, Inc.,* 49 Cal.App.4th 903, 57 Cal.Rptr.2d 129, 137–39 (1996); *Southwest Gas Corp. v. Vargas,* 111 Nev. 1064, 901 P.2d 693 (1995). Given the Vermont Supreme Court's reliance on *Toussaint* in its

decision in *Ainsworth,* it is unlikely that it would adopt such a rule of deference to the employer.

4. *Ontario Knife Co. v. NLRB,* 637 F.2d 840 (2d Cir.1980) involved an employer's refusal to reinstate an employee who walked off the job after protesting a condition of employment. The case noted that action taken by an individual must be "looking toward group action" in order to qualify as protected concerted activity. *Id.* at 845.

case, there is no suggestion whatsoever that Raymond was acting on behalf of others as well as himself, either with or without their knowledge, or that he was invoking an employment-related statute, or relying on the terms of a collective bargaining agreement. The NLRA does not preempt Raymond's claim in Count II.

 Raymond has claimed that his contract of employment included the right to make use of IBM's Open Door Policy, and the right not to be fired for having pursued an Open Door communication. IBM's August, 1993 employee handbook describes the Open Door Policy in a section entitled "Communications Channels."

> IBM and its units have a number of formal programs and policies designed to promote good two-way communications. Such communications are key to an effective employee-manager relationship. While managers are encouraged to hold frequent meetings with their employees, you should take the initiative whenever you feel the need to talk to your manager on matters related to current performance or the workplace. You should ask questions, say what is bothering you, what you like and don't like—always being candid, open and specific. You should also feel free to offer ideas on how things could be improved.
>
> \* \* \* \* \* \*
>
> Another basic communications channel is the *Open Door*. The Open Door Policy provides an employee an opportunity to request a review by a higher management level of the actions of those who are immediately over him or her in authority.
>
> \* \* \* \* \* \*
>
> Remember, no one can know your concerns, questions, ideas and suggestions unless you voice them.

"About Your Job" at 12–13 (paper 39, att. C). In a prefatory section, the handbook characterizes the encouragement of two-way communication as one of IBM's "enduring principles and values." *Id.* at 12.

None of the employee handbooks submitted to the Court contains an explicit promise of non-retaliation for making use of the Open Door Policy. The 1993 handbooks do explicitly state in a different section that employment may be ended by IBM at any time for any reason. Raymond claims that it was understood company-wide, however, that one could make an Open Door complaint without fear of reprisal. In support of this contention he offered the testimony of Personnel Advisor Potts:

> Q So if I'm an employee at IBM and I'm having a problem talking to my manager, I might go to a person like you?
>
> A Can come to me.
>
> Q Is this part of an open door policy at IBM?
>
> A Yes.
>
> Q If an employee in a department—if an employee comes to you with a concern, is it treated confidentially?
>
> A Yes.
>
> Q Is it understood that the employee is not going to be disciplined for coming to you?
>
> A Absolutely.

Potts Dep. at 8 (paper 32, att. 4).

Raymond used the Open Door communication channel in September of 1993 to discuss with Michael Wilson, his manager's manager, his concerns about being passed over for the day shift, and about his manager's refusal to enforce safety precautions against some of his fellow employees. Raymond Dep. at 28–33 (paper 22, att. 1). He felt that this activity might have influenced the decision to terminate him in November, because Luneau, his manager, had spoken to him about going over his head to Wilson about the day shift issue. *Id.* at 48. He did not know whether management retaliated against him because of his safety complaint. *Id.* at 81.

 An employer's procedures or practices may be enforceable, whether written or unwritten, if they are clearly established and uniformly and consistently applied throughout the company. *Ross*, 164 Vt. at ——, 665 A.2d at 585. The Potts testimony suggests the existence of a company-wide policy or practice protecting employees from retaliation for making Open Door complaints.

An employer may not be bound, however, if it conspicuously and effectively states that a policy is not intended to be part of the employment relationship. *Id.* at ——, 665 A.2d at 584. IBM has stated that it can fire an employee at any time for any reason. Whether this disclaimer "effectively trumps" a claim that an employee cannot be fired for making an Open Door complaint will depend on the facts as they are developed at trial. *Id.* at ——, 665 A.2d at 583.

IBM has also argued that it did not fire Raymond in retaliation for an Open Door complaint, but for breaking into his manager's office and reading confidential personnel files. "Where the employer alleges that the employee was discharged for one reason ... and the employee presents evidence that he was really discharged for another reason ... the question ... is one of fact for the jury. The jury is always permitted to determine the employer's true reason for discharging the employee." *Ainsworth,* 156 Vt. at 330, 592 A.2d 871 (quoting *Toussaint,* 292 N.W.2d at 896).

Raymond's evidence that he was discharged in retaliation for his Open Door complaint consists of 1) his feeling that there was a connection between his complaint and his discharge because after he'd made his complaint, his manager had told him that he was not going to the day shift and Raymond didn't have to go tell Wilson about it; and 2) the timing of the discharge relative to the Open Door complaint, a lapse of at most two months.

In retaliatory discrimination cases, the Vermont Supreme Court has held that the timing of an adverse employment decision against an employee, relative to the protected (from discrimination) activity in which he was engaged, may alone be a "sufficient showing, for purposes of surviving summary judgment, of a causal connection between [them]." *Murray v. St. Michael's College,* 164 Vt. 205, ——, 667 A.2d 294, 300 (1995) (citing *Gallipo v. City of Rutland,* 163 Vt. 83, 656 A.2d 635, 642 (1994)).[5] In this breach of contract case, the Court will adopt the same rule: the timing of the complaint and the alleged retaliatory action may suffice to withstand summary judgment. Both *Gallipo* and *Murray* involved time lapses of longer than two months; the lapse in Raymond's case between his Open Door complaint and his discharge from employment is sufficiently short that there is a genuine issue of material fact concerning the true reason for the discharge.

If a jury finds under all the circumstances that IBM's disclaimer, asserting that all employment was at-will, was not effective against a retaliatory termination for making an Open Door complaint, then it will be permitted to determine IBM's true reason for firing Raymond. IBM's motion for summary judgment on Count II is, accordingly, denied.

### III. Defamation (Count IV)

In Count IV, Raymond alleges that IBM defamed him under the doctrine of compelled self-publication, because he was forced to repeat the allegedly unfounded reason he was fired in the course of applying for other employment. IBM argues that it is entitled to summary judgment because this doctrine is not and should not be recognized in Vermont, and because Raymond was not forced to disclose the reason he was fired.

The elements of a defamation action are:

(1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person;

---

5. Both *Murray* and *Gallipo* involved claims of retaliatory discrimination for asserting rights protected by statute. In retaliatory discrimination cases, a plaintiff must present a prima facie case by showing that he was engaged in a protected activity, his employer was aware of that activity, he suffered adverse employment decisions, and there was a causal connection between his activity and the adverse decision. Once a prima facie case is established, the bur-den shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged conduct. *Murray,* 164 Vt. at ——, 667 A.2d at 299. As Raymond has not asserted a claim of retaliatory discrimination, but a claim of breach of a contract of employment which prohibited discharge in retaliation for making employment-related complaints, the *Murray* burden-shifting framework does not apply in this case.

(4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages.

*Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 291, 576 A.2d 441 (1990) (quoting *Ryan v. Herald Ass'n, Inc.*, 152 Vt. 275, 277, 566 A.2d 1316, 1317–18 (1989)). An employer may enjoy a qualified privilege to protect its legitimate business interests, which may be defeated by a showing of malice, either actual or implied. Malice may be inferred upon a showing that a defendant knew the statement was false or acted with reckless disregard of its truth. *Lent v. Huntoon*, 143 Vt. 539, 549, 470 A.2d 1162 (1983).

In order to make out a case of defamation, the statement in question must have been communicated to someone other than the plaintiff. If the plaintiff is responsible for the publication to a third party, ordinarily this requirement of publication is not satisfied. *Wilcox v. Moon*, 64 Vt. 450, 452, 24 A. 244 (1892) (the defendant is not liable for a publication by the plaintiff, for it is not the defendant's act). However, publication may be established if the defendant knows that of necessity the plaintiff must disclose the statement. *Id.*

IBM has cited the case of *Crane v. Darling*, 71 Vt. 295, 300, 44 A. 359 (1899) as authority for the contention that Vermont has refused to recognize the doctrine of compelled self-publication. In *Crane*, a slander case, the Vermont Supreme Court affirmed a judgment for the plaintiff, holding only that the trial court substantially complied with defendant's requested jury instruction, that he could not be held liable for any circulation by others unless procured by him. It explicitly made no ruling on whether the requested instruction was a sound statement of the law. *Id.* at 298–99, 44 A. 359.

In *Burt v. Standard Register Co.*, No. 90–295, slip op. at 14–15 (D.Vt. June 13, 1992), and in *Moss v. Mutual of Omaha Ins. Co.*, No. CIV.A. 89–138, 1990 WL 485666 at *5 (D.Vt. Apr. 9, 1990), judges of this district held that *Crane* indicated that Vermont does not and would not recognize the doctrine of "compelled self-publication."

Respectfully, this Court disagrees that *Crane* compels a conclusion that Vermont would not recognize the doctrine. In *Wilcox*, the Vermont Supreme Court clearly recognized that a defendant would be liable if he knew that a plaintiff would have to publish the statement, and *Crane* does not hold to the contrary. The Vermont Supreme Court has not recently considered whether it recognizes the doctrine of compelled self-publication, however.

In *Lewis v. Equitable Life Assurance Society*, 389 N.W.2d 876 (Minn.1986), a leading case on the doctrine of compelled self-publication, the Supreme Court of Minnesota adopted a narrow exception to the rule that publication by the plaintiff will not permit recovery. The Court held that when the originator of the defamatory statement "knows, or should know, of circumstances whereby the defamed person has no reasonable means of avoiding publication of the statement," the resultant damages "are fairly viewed as the direct result of the originator's actions." *Id.* at 888. To succeed on his claim, therefore, a plaintiff must show both foreseeability and necessity. *See* David J. Blythe, *Workplace Defamation: Public Policy, Compelled Self-Publication, and the Vermont Constitution*, 16 Vt. L.Rev. 341, 381–82 (1991).

Courts in eleven jurisdictions have recognized the doctrine of compelled self-publication.[6] Courts in seven jurisdictions have rejected the doctrine.[7] It seems likely, given

---

6. *See,* in addition to *Lewis, McKinney v. County of Santa Clara*, 110 Cal.App.3d 787, 168 Cal. Rptr. 89 (1980); *Churchey v. Adolph Coors Co.*, 759 P.2d 1336 (Colo.1988); *Belcher v. Little*, 315 N.W.2d 734 (Iowa 1982); *Polson v. Davis*, 635 F.Supp. 1130 (D.Kans.1986); *Carey v. Mt. Desert Island Hosp.*, 910 F.Supp. 7 (D.Me.1995); *Grist v. Upjohn Co.*, 16 Mich.App. 452, 168 N.W.2d 389 (1969); *Herberholt v. dePaul Community Health Ctr.*, 625 S.W.2d 617 (Mo.1981); *Elmore*

*v. Shell Oil Co.*, 733 F.Supp. 544 (E.D.N.Y.1988); *Bretz v. Mayer*, 1 Ohio Misc. 59, 203 N.E.2d 665 (Comm.Pleas 1963); *First State Bank v. Ake*, 606 S.W.2d 696 (Tex.Civ.App.1980).

7. *See Gore v. Health–Tex, Inc.*, 567 So.2d 1307 (Ala.1990); *Layne v. Builders Plumbing Supply Co.*, 210 Ill.App.3d 966, 155 Ill.Dec. 493, 569 N.E.2d 1104 (1991); *Church of Scientology v. Green*, 354 F.Supp. 800 (S.D.N.Y.1973); *Yetter v.*

Vermont's longstanding recognition of a defendant's liability for a plaintiff's publication-by-necessity, that Vermont would join Minnesota and the other jurisdictions which recognize the doctrine.

■ Raymond may satisfy the publication element of his defamation claim by presenting evidence that IBM knew, or should have known, that Raymond had no reasonable means of avoiding publication, or, in other words, that he was under strong compulsion to publish the statement. *See Carey v. Mt. Desert Island Hosp.*, 910 F.Supp. 7, 11 (D.Me.1995); *Lewis*, 389 N.W.2d at 888; *McKinney v. County of Santa Clara*, 110 Cal.App.3d 787, 168 Cal.Rptr. 89, 93–95 (1980). Whether Raymond was compelled to disclose the reason he was fired will be an issue for the finder of fact.

■ Of course, IBM's affirmative defenses are not abrogated. If, for example, the company can demonstrate that its qualified privilege for the protection of legitimate business interests applied to these circumstances, then, to defeat the privilege, Raymond must show that IBM acted with malice.

IBM's motion for summary judgment as to Count IV is denied.

## CONCLUSION

IBM's Motion for Summary Judgment (paper 21) is DENIED. Count III is Dismissed, having been withdrawn by the Plaintiff.

*Ward Trucking Corp.*, 401 Pa.Super. 467, 585 A.2d 1022 (1991); *Carson v. Southern Ry. Co.*, 494 F.Supp. 1104 (D.S.C.1979); *Doe v. Smith-Kline Beecham Corp.*, 855 S.W.2d 248 (Tex.App. 1993), *aff'd as modified*, 903 S.W.2d 347 (1995); *Lunz v. Neuman*, 48 Wash.2d 26, 290 P.2d 697 (1955).